[PUBLISHED]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 22, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-14223

_____

D.C. Docket No. 04-20404-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDUARDO A. MASFERRER,

Defendant-Appellant.

------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
------------------------------------

**(January 22, 2008)**

Before DUBINA and KRAVITCH, Circuit Judges, and GOLDBERG,* Judge.

GOLDBERG, Judge:____

_____

* Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

Eduardo A. Masferrer appeals his conviction and sentence for numerous counts relating to bank and securities fraud. Masferrer argues that his case was improperly assigned to Judge K. Michael Moore, and he is therefore entitled to a new trial before a randomly selected judge. He also appeals several evidentiary rulings and his thirty-year sentence.

## I. BACKGROUND

Masferrer was the Chairman and CEO of Hamilton Bank and its holding company, Hamilton Bancorp (collectively, "Hamilton Bank"). Beginning in 1997, the bank invested in approximately $22 million worth of Russian debt instruments ("Russian assets"), which dramatically lost value during the summer of 1998. In order to conceal this loss, Masferrer and his co-conspirators allegedly devised a scheme that would enable Hamilton Bank to liquidate its Russian assets at full face value through "ratio swaps." Ratio swaps are exchanges of assets in which the prices of the swapped items are deemed to be at face value, with the difference between the face and fair market value of the seller's asset offset by a similar disparity in the asset received in return. Ratio swaps are not per se fraudulent, but accounting rules require that the exchanges be recorded as related transactions and any loss must be recognized immediately. Masferrer swapped the Russian assets in exchange for other debt instruments, but knowingly refused to record the swaps

2

as related transactions. As a result, it appeared that Hamilton Bank managed to sell its Russian assets at face value, thereby hiding their highly discounted sales prices. The ratio swaps turned out to be financially disastrous for Hamilton Bank. The failure to properly account for the swaps caused Masferrer and his co-conspirators to make material misrepresentations to the bank's internal and independent auditors, federal regulators, and the investing public. Masferrer was found guilty of all 18 counts of the indictment and was sentenced to thirty years imprisonment.

## II.    DISCUSSION

### A. Case Assignment

Masferrer claims that he is entitled to a new trial because Judge Lawrence King, after filing an order of recusal, transferred his case to Judge K. Michael Moore. Even if we assume, arguendo, that Judge King's actions technically violated the local rules governing case assignments or the recusal statute, 28 U.S.C. § 455, vacatur is only an available remedy when the defendant can point to particular circumstances that prove that "the potential bias on the part of the judge represented a risk of injustice to it." United States v. Cerceda, 172 F.3d 806, 813 (11th Cir. 1999) (en banc) (per curiam); see also Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 864, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)

(holding that a judicial action taken in violation of recusal statute should be remedied by vacatur only after the court considers the risk of injustice to the parties, the risk that denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process). Masferrer has not pointed to any particular circumstances indicating that there was any potential bias on the part of Judge Moore that represented a risk of injustice to any party, and therefore a new trial is not warranted.

## B. Excluded Evidence

Masferrer claims that the district court violated his Fifth and Sixth Amendment rights when it excluded evidence (1) showing that three of the Russian loans involved in the "swap" transactions were paid off in full within one year of their sale, and (2) showing that after the new debt instruments were received in exchange for the Russian assets, the bank's loan officers deemed them creditworthy. Masferrer claims this evidence shows that it was reasonable for him to believe that both the Russian loans (sold by Hamilton bank) and the new debt instruments (purchased by Hamilton bank) were worth their full face value at the time of the swap. According to Masferrer's theory, if he reasonably could have believed that the loans were worth their full face value at the time of their

4

sale and purchase, he did not intend to engage in an illegal "swap" to defraud the government.

Masferrer's argument fails because "where the proffered evidence does not bear a logical relationship to an element of the offense or an affirmative defense . . . a defendant has no right to introduce that evidence and a district court may properly exclude it." United States v. Hurn, 368 F.3d 1359, 1365 (11th Cir. 2004). The only evidence relevant to Masferrer's intent is what he believed *at the time* of the transactions. See id. at 1366 (holding that proffered evidence could only tend to negate mens rea if defendant knew about it at the time she made false statements). The fact that the Russian loans were ultimately paid off is not relevant to the question of whether Masferrer intended to defraud the government and investors at the time of the questionable transactions. Likewise, the fact that the new debt instruments were found to be creditworthy after their purchase does not tend to prove that Masferrer believed they were worth face value at the time of their purchase. Masferrer was free to present evidence concerning his belief about the value of the loans, as long as it reflected what he believed during the relevant time period. The district court did not violate Masferrer's constitutional rights when it excluded evidence of the value or creditworthiness of the loans after the swap transaction took place.

5

**C. Government Evidence Relating to the Value of Acquired Assets**

Masferrer argues that the district court abused its discretion in admitting, over his hearsay objection, (1) historical financial data provided by the Bloomberg Financial Service and (2) testimony concerning the market values assigned to the Russian assets and new debt instruments by Standard Bank and West Merchant Bank on their trading books at the time of the swap. "A district court's ruling on the admissibility of evidence is reviewed for abuse of discretion." United States v. Schlei, 122 F.3d 944, 980 (11th Cir. 1997) (internal quotations omitted).

*(i) Bloomberg Evidence*

In order to calculate the bank's losses from the ratio swaps, OCC regulators and Hamilton Bank's accounting personnel reconstructed the trades and determined the market values for the acquired assets at the time of the swaps. The bank's accountants calculated an unreported $22 million loss. This figure was derived from computerized records of the Bloomberg Financial Service. At trial, a Bloomberg executive explained that Bloomberg collects market price quotes for all types of markets, including debt securities markets. The actual Bloomberg price quotes used by the accountants and regulators contained were also admitted. On appeal, Masferrer argues that the Bloomberg quotes and related testimony should have been excluded because they constitute inadmissible hearsay and

improper "expert" opinion pursuant to <u>Daubert v. Merrell Dow Pharms.</u>, 509 U.S. 579 (1993) and Federal Rule of Evidence 702.

The Bloomberg market quotes are admissible pursuant to Federal Rule of Evidence 803(17), which provides a hearsay exception for "[m]arket reports, commercial publications[–]Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations." FED. R. EVID. 803(17). The government presented evidence at trial establishing that Bloomberg financial information is universally relied upon by individuals and institutions involved in financial markets. The fact that the Bloomberg information was used to price an illiquid asset does not bring it outside the scope of 803(17). Therefore, the district court did not err by allowing the government to introduce the Bloomberg data. Additionally, the Bloomberg executive's testimony does not implicate <u>Daubert</u> or Rule 702, because it is not expert opinion testimony. Instead, it only provided the necessary context for the admissible market quotations.

*(ii) Evidence of market values of the Russian loans and new debt instruments from West Merchant and Standard Bank*

Peter Kennedy testified that he agreed, on behalf of his employer, Standard Bank, to engage in a ratio swap involving one of the Russian loans. According to the terms of this swap, Standard bank would purchase the $7.5 million Russian

7

loan, at face value, in exchange for Hamilton Bank's reciprocal purchase, at face value, of debt instruments selected by Masferrer. Standard Bank did not own those debt instruments at the time, and had to purchase most of them from the secondary market in order to complete the swap. Kennedy did not execute the purchases of these instruments and could not independently recall their individual prices. However, the prices were contemporaneously recorded on an internal bank memorandum which was authenticated and received into evidence as a business record. Kennedy did recollect that the instruments selected by Masferrer were obtained in the secondary market at between 50 and 88% of face value.

Masferrer argues that Kennedy's testimony was inadmissible hearsay because he had no personal knowledge of the purchase prices. However, the purpose of Kennedy's testimony was not to establish purchase price. Instead, the memorandum containing the prices was received into evidence as a business record. The purpose of Kennedy's testimony was to demonstrate that Masferrer knew that the swapped assets were not worth their face value.[1] According to Kennedy, Masferrer knew that Standard Bank would have to acquire the new debt instruments on the open market below face value. Whether or not Kennedy knew the specific price at which the assets were purchased by Standard Bank was not

---

[1] Kennedy did have personal knowledge of the fact that the purchase prices of the Latin assets were at 50-88% of their face value.

particularly relevant to his testimony.[2]  As such, the district court did not commit

error when it admitted this evidence.

### D. Sentencing Guidelines Manual

Masferrer claims that the district court violated his rights under the Ex Post

Facto Clause of the Constitution when it applied the 2001 version of the

Sentencing Guidelines Manual during sentencing.  The sentencing court should

normally apply the guidelines in effect at the time of the sentencing.  See 18

U.S.C. § 3553(a)(4)(A) (2000).   However, if a more lenient guidelines sentence

was in effect at the time of the offense, the Guidelines Manual applicable at the

time of the offense must be applied to avoid an Ex Post Facto Clause violation.

See United States v. Simmons, 368 F.3d 1335, 1338 (11th Cir. 2004).  Masferrer

asserts that all of his alleged criminal conduct occurred by December 2000, before

the 2001 Guidelines Manual was in effect.

The sentencing court appropriately used the 2001 Guidelines Manual to

sentence Masferrer.  The jury found Masferrer guilty of Count 1, which alleged

conspiracy to defraud the United States.  Because this conspiracy was to "commit

*one crime* in *two ways*," (i.e., conspiracy to defraud the United States by

---

[2] In his initial brief, Masferrer also argues that "Tweedley's similar testimony concerning how [West Merchant Bank] allegedly determined values should have been disallowed for the same reason."  Appellant's Br. 53.  Tweedley worked for [West Merchant Bank], which is a bank involved in a different ratio swap orchestrated by Masferrer.  Tweedley's testimony is admissible for the same reasons as Kennedy's.

9

obstructing the OCC or SEC), the court was simply required to find by a preponderance of the evidence that Masferrer conspired to obstruct the SEC in 2002. See United States v. Riley, 142 F.3d 1254, 1257 (11th Cir. 1998) (per curiam) (quoting United States v. Edwards, 105 F.3d 1179, 1181 (7th Cir. 1997)) . The district court adopted the presentence report, and thereby satisfied this requirement.[3] See id. Additionally, the jury returned a special verdict finding Masferrer guilty of conspiracy to make false statements to the SEC (object "h" in the indictment). Because Masferrer's co-conspirators obstructed the SEC in 2002 in furtherance of the conspiracy, the district court correctly applied the 2001 version of the Sentencing Guidelines Manual.[4]

---

[3] Masferrer focuses his argument on the fact that a multi-object conspiracy was also alleged in Count 1. This is not relevant because the first part of Count 1 encompasses the relevant conduct that took place in 2002.

[4] Masferrer claims that there was no evidence that he conspired with anyone to obstruct the SEC's investigation in 2002. This argument is meritless. There was sufficient evidence presented at trial that obstruction of the SEC, perpetrated by Masferrer's co-conspirators, was part of the conspiracy to defraud the United States. In the case of a criminal conspiracy, the guidelines sentence shall be based on, inter alia, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ." U.S.S.G. § 1B1.3(a)(1)(B) (2001). There was also no evidence that Masferrer withdrew from the conspiracy. See United States v. Young, 39 F.3d 1561, 1571 (11th Cir. 1994) (requiring affirmative steps to defeat the objects of the conspiracy and communication of these steps to co-conspirators).

### E. Loss Calculation

"A district court's interpretation of the sentencing guidelines is subject to *de novo* review, while its factual findings are reviewed for clear error." United States v. Douglas, 489 F.3d 1117, 1129 (11th Cir. 2007) (per curiam).

The district court found, through adoption of the presentence report, that Masferrer's conduct resulted in losses of between $20 and $40 million. This figure included, inter alia, (1) losses borne by investors who purchased Hamilton Bank stock in reliance upon its misleading 1998 earnings pronouncements; and (2) the losses borne by Hamilton Bank due to the ratio swaps and by the inflated bonuses paid to the conspirators. Masferrer disputes the propriety of both of these loss calculations, and concedes only the $1 million in bonuses improperly conferred upon the conspirators.

When calculating loss to victims according to the sentencing guidelines, the district court need only make a reasonable estimate of the loss. See United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002). The district court carefully limited the victim group to those investors who had purchased Hamilton Bank stock after Masferrer made fraudulent misrepresentations about the bank's 1998 earnings. By limiting the victim group in this way, the district court reasonably estimated the loss to investors due to Masferrer's conduct. See id. at 1296 (stating

that limiting victim class to those who bought stock after defendant's fraudulent statements was an appropriate method of calculating loss).

In addition to investor loss, the sentencing court adopted the presentence report's calculation of a $22 million loss to Hamilton Bank. Masferrer claims that he did not cause $20 million of that loss because it already existed before the swaps took place. In other words, Masferrer asserts that if the $22 million Russian assets were worthless at the time of the swap, then the bank would have already suffered that unrealized loss before he managed to exchange them for different assets. Instead, Masferrer claims, he should be credited for the $20 million the bank received at face value pursuant to the swap arrangement. Therefore, the bank's loss only amounts to about $2 million.

The district court found that Masferrer caused the bank to realize a $22 million loss when it was required to restate its earnings for 1998. Masferrer may not have caused the Russian assets to decline in value, but his criminal activity did cause them to be sold when they were in fact worthless, and consequently, caused the $22 million loss to be realized by the bank. Consequently, the district court's calculation of total loss between $20 and $40 million was not clearly erroneous.

### III.     CONCLUSION

For the reasons set forth above, Masferrer's convictions and sentence are

**AFFIRMED**.