# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

––––––

Argued May 6, 2011            Decided July 12, 2011

No. 10-1288

CARLOS LOUMIET,
PETITIONER

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,
RESPONDENT

––––––

On Petition for Review of an Order
of the Department of Treasury

––––––

*Alan G. Greer* argued the cause for petitioner. With him on the briefs was *Eric M. Sodhi*.

*Douglas B. Jordan*, Attorney, Office of the Comptroller of the Currency, argued the cause for respondent. With him on the brief were *Horace G. Sneed*, Director of Litigation, and *Allen H. Denson*, Attorney.

2

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Carlos Loumiet appeals a final decision and order of the Office of the Comptroller of the Currency ("Comptroller") requiring him to bear the costs of his own defense in an underlying administrative proceeding in which he prevailed. We reverse that decision, finding the Comptroller was not "substantially justified" in bringing the underlying administrative proceedings against Loumiet, and therefore Loumiet is entitled to attorney's fees under the Equal Access to Justice Act, 5 U.S.C. § 504. We remand for the Comptroller to calculate the amount of those fees.

I

In 1998, Hamilton Bank ("Bank") engaged in "adjusted price trades" or "ratio swaps," a type of bank and securities fraud when used to conceal losses in which financial instruments are sold at face value even though the instruments are actually worth far less. In this case, Hamilton invested $22M in Russian debt instruments, which subsequently lost value in the summer of 1998. *See United States v. Masferrer*, 514 F.3d 1158, 1160 (11th Cir. 2008) (describing the Bank's fraudulent transactions). To conceal the loss, the Bank swapped the Russian debt instruments for other financial instruments. *Id.* General accounting rules require such swaps to be accounted for as related transactions. *Id.* By not doing so, the Bank made it appear as if it "managed to sell its Russian assets at face value, thereby hiding their highly discounted sales prices." *Id.*

The Comptroller discovered the Bank's ratio swaps and, in April 2000, issued a temporary cease-and-desist order requiring the Bank to take remedial measures. The Bank's Audit Committee retained an outside law firm, Greenberg Traurig, LLP ("Greenberg"), to conduct an independent investigation of the alleged fraud. Greenberg, led by Loumiet, who was a partner at the firm at the time, reviewed the pertinent documents, conducted personal interviews of Bank executives, and ultimately issued a report to the Bank's Audit Committee on November 15, 2000 ("November Report"). The November Report found "no convincing evidence" to establish Bank executives "intentionally misled" Deloitte and Touche ("Deloitte"), the Bank's outside accounting auditor, or the Bank's own Audit Committee. *See Loumiet*, OCC-AA-EC-06-102 (July 20, 2010) (initial EAJA Decision), *reprinted in* Joint Appendix ("J.A.") 1868. Nevertheless, the Bank restated its public financial statements, believing the November Report provided a sufficient basis to conclude the swaps should have been accounted for as related transactions.

In January 2001, the Comptroller sent Greenberg a letter in response to the November Report. The letter indicated the Comptroller had taken the statement of an individual who had participated in the swap transactions (i.e. a counter-party) as part of its on-going investigation of the Bank. According to the Comptroller, the statement contradicted the November Report. The Comptroller also notified Greenberg orally of six red flags indicating the Bank had engaged in adjusted price trades. As a result, Greenberg drafted a second report, which it provided to the Bank's Audit Committee in March 2001 ("March Report"). The March Report found the counter-party's statement was consistent with statements made by Bank executives during Greenberg's initial independent investigation. The March Report also concluded the

Comptroller's red flags did not alter the previous conclusions of the November Report.

The Comptroller issued its own report alleging wrongdoing at the Bank ("Comptroller Report"). As a result of the OCC Report, the Bank shut down. Three Bank executives entered into consent orders with the Comptroller, barring each from participating in the affairs of a federally insured bank in the future. Greenberg also entered into a consent order, agreeing to pay $750,000 in fines. Finally, the Comptroller closed the Bank and appointed the Federal Deposit Insurance Corporation as its receiver.

Several years later, the Comptroller's Enforcement and Compliance Division ("Division") invoked the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") of 1989, Pub. L. No. 101-73, 102 Stat. 183 (codified in scattered sections of Title 12 of the U.S. Code), and initiated an administrative proceeding against Loumiet. The Division alleged Loumiet was an "institution-affiliated party" ("IAP"), who, in participating in Greenberg's independent investigation of the Bank, had "knowingly or recklessly . . . breach[ed his] fiduciary duty," and as a result "caused . . . a significant adverse effect on" the Bank. 12 U.S.C. § 1813(u)(4). The Division sought to assess a $250,000 monetary penalty against Loumiet, among other sanctions. After a three week bench trial, an Administrative Law Judge ("ALJ") recommended dismissal of the Division's claims ("ALJ FIRREA Decision"). *Loumiet¸* OCC-AA-EC-06-102 (June 17, 2008), *reprinted in* J.A. 950. The Comptroller reviewed the ALJ's recommendation ("Comptroller FIRREA Decision") and agreed dismissal was appropriate, but "largely rejected" the "reasoning and conclusions" in the ALJ FIRREA Decision. *Loumiet*, OCC-AA-EC-06-102 at 17 (July 27, 2009)*, reprinted in* J.A. 1043.

Following the Comptroller FIRREA Decision, Loumiet filed an EAJA application seeking attorney's fees for his defense in the agency FIRREA adjudication. An ALJ recommended denying Loumiet's application ("ALJ EAJA Decision"), concluding that the Division's position in the underlying agency proceeding was "substantially justified . . . in both law and fact" and therefore Loumiet was not entitled to attorney's fees. *Loumiet*, OCC-AA-EC-06-102 at 7 (July 20, 2010). Because neither party sought review by the Comptroller, the ALJ's recommendation became the final decision of the Comptroller. 31 C.F.R. § 6.15. Reviewing that decision for substantial evidence, *see* 5 U.S.C. § 504(c)(2) (specifying the standard of review); *Kuhns v. Bd. of Governors of Fed. Reserve Sys.*, 930 F.2d 39, 41 (D.C. Cir. 1991) (reviewing agency's EAJA decision for substantial evidence); we reverse and remand for further considerations consistent with this opinion.

## II

The EAJA provides: "An agency that conducts an adversary adjudication shall award, to a prevailing party . . . fees and other expenses incurred by that party in connection with that proceeding, unless the adjudicative officer of the agency finds that the position of the agency was substantially justified or that special circumstances make an award unjust." 5 U.S.C. § 504(a)(1). The Comptroller, who bore the burden in the EAJA proceeding before the ALJ of demonstrating the Division's position was substantially justified, *see F.J. Vollmer Co., Inc. v. Magaw*, 102 F.3d 591, 595 (D.C. Cir. 1996), concedes Loumiet was a "prevailing party" under the EAJA. Thus, Loumiet is entitled to attorney's fees unless the "administrative record, as a whole, which is made in the adversary adjudication," 5 U.S.C. § 504(a)(1), shows the Division's position in the underlying agency FIRREA

adjudication was "justified in substance or in the main." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

A

The Division claimed the Bank Audit Committee engaged Loumiet to provide services to the Bank, and Loumiet's conduct in providing those services met all the elements necessary to establish him as an IAP. FIRREA defines an IAP to include:

> Any independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in—(A) any violation of any law or regulation; (B) any breach of fiduciary duty; or (C) any unsafe or unsound practice, which caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on, the insured depository institution.

12 U.S.C. § 1813(u)(4). The Comptroller FIRREA Decision found the administrative record "lack[ed] sufficient evidence that the two reports prepared by Mr. Loumiet caused, or were likely to cause, harm to the [B]ank that satisfies the 'effect' requirement . . . ." In other words, the Division could not show that the November or March Reports caused "more than a minimal financial loss to, or a significant adverse effect on," the Bank. 12 U.S.C. § 1813(u)(4). The ALJ EAJA Decision, nevertheless, found the Division's litigation position "supported by a variety of highly-qualified expert witnesses," "stood a reasonable chance of succeeding on the merits," and "represented a good-faith and credible interpretation of law." *Loumiet*, OCC-AA-EC-06-102 at 7 (July 20, 2010), *reprinted in* J.A. 1873.

To justify the ALJ EAJA Decision, the Comptroller now argues the November Report and the March Report falsely exonerated Bank executives, and as a result, the Bank's Audit Committee failed to replace "at least one of the Bank's senior officers." Resp't's Br. at 29. Said differently, the Comptroller alleges the harm caused by Loumiet's conduct was the continued employment of the Bank's executives. In support, the Comptroller relies upon the expert report of Charles Rardin, a bank examiner with the Comptroller. Rardin's report stated that "the [November and March] Reports led the Bank to retain the dishonest officers. In particular, the Reports gave the officers the shield of a large law firm's exoneration from wrongdoing, which protected the officers regardless of whether others at the Bank knew the Reports were false. Retaining dishonest senior executive officers is likely to harm a bank." *Loumiet*, AA-EC-06-102 at 18 (July 31, 2007) (expert witness report), *reprinted in* J.A. 676. Rardin's report also says "the [November and March] Reports facilitated the perpetuation of the Bank's inaccurate public financial statements." *Id.* at 7.

Section 1813(u)(4) requires that an IAP cause harm to the Bank itself. Thus, showing the November and March Reports exonerated Bank executives is not sufficient to qualify Loumiet as an IAP, without some evidence linking the continued employment of the Bank executives to a significant adverse effect on the Bank. The administrative record is noticeably devoid of such evidence. There is no evidence the continued employment of Bank executives after the November and March Reports caused reputational harm to the Bank, impacted the internal culture of the Bank, or created any other effect on the Bank. Even Rardin's report is unhelpful. It says only that retaining the Bank executives would "likely" harm the Bank. It is true that demonstrating the continued employment of Bank executives "is likely to

cause harm," 12 U.S.C. § 1813(u)(4), could be sufficient to classify Loumiet as an IAP (and thus to show substantial justification under the EAJA). But the Agency's evidence here—a conditional statement from an Agency examiner that some unspecified harm may result—falls short of the necessary quantum of proof. Because Rardin's statement was both vague and unsubstantiated, it does not demonstrate the Division's litigating position was justified, let alone "substantially" so. In addition, Rardin's reliance on the Bank's "inaccurate public financial statements" is a red herring, as the Bank promptly revised its public financial statement as a result of the November Report. Thus, the Bank executives' continued employment did not delay the restatement.

The Comptroller offers a cornucopia of alternative arguments. None merit much consideration. First, the Comptroller argues the Bank did not obtain its money's worth from Greenberg's independent investigation. But this is not the type of "financial loss" or adverse effect § 1813(u)(4) contemplates. *Cf. Lindquist & Vennum v. FDIC*, 103 F.3d 1409, 1419–21 (8th Cir. 1997) (refusing to enforce an order of the FDIC requiring a law firm to refund the fees it charged). The focus of § 1813(u)(4) is on independent contractors "conducting the affairs of" the Bank, *Grant Thornton, LLP v. Office of Comptroller of Currency*, 514 F.3d 1328, 1331–32 (D.C. Cir. 2008) (quoting 12 U.S.C. § 1818(i)(2)(B)(i)(II)), such as an attorney who provides "oral and written advice" that a particular investment was in the Bank's best interest. *See, e.g.*, *Cavallari v. Office of Comptroller of Currency*, 57 F.3d 137, 142 (2d Cir. 1995). In that case, the "financial loss" or "significant adverse effect" on the bank is the lost value of its investment, not the value of services furnished by independent contractors investigating bank affairs after the suspect transaction occurred. Indeed,

the Comptroller's approach would vitiate the "significant adverse effect" requirement altogether, as § 1813(u)(4) presumes an independent contractual relationship, such as that of a lawyer, appraiser or accountant. And, according to the Comptroller, any such relationship could result in the necessary harm if the work did not end well.

Second, the Comptroller argues the Bank made a $15M loan that caused significant harm. But there is no record evidence of the loan's causation. Consequently, it is impossible to determine whether Loumiet's alleged misconduct indirectly caused the loan to be made.

Finally, the Comptroller argues the Division's litigating position is substantially justified because the legal issue presented is novel. The Comptroller cites in support *Hill v. Gould*, 555 F.3d 1003, 1008 (D.C. Cir. 2009), a case in which this court affirmed the denial of a fee award because the agency "took a reasonable approach to [a] relatively unsettled area of administrative law." The Comptroller argues the "effects" prong of § 1813(u)(4) is a similarly unsettled area of law because only one court of appeals had addressed the provision when the Division filed its Notice of Charges against Loumiet in the underlying administrative FIRREA adjudication. *See Cavallari*, 57 F.3d at 142. But whether the November or March Reports "adversely affected" the Bank is not a legal issue. And, to the extent that issue incidentally involves questions of law, those questions focus on causation, a topic that can hardly be described as novel. *Cf. Palsgraf v. Long Island R. Co.*, 248 N.Y. 339 (1928).

## B

A few lingering issues remain. In order to receive attorney's fees under the EAJA, a prevailing party must have

previously "incurred" the fees. In addition, the EAJA provides that "attorney or agent fees shall not be awarded in excess of $125 per hour unless the agency determines by regulation that an increase in the cost of living or a special factor . . . justifies a higher fee." 5 U.S.C. § 504(b)(1)(A). Loumiet argues he incurred all the attorney's fees he requests, even though Greenberg advanced a portion of the fees. Loumiet also contends he may be reimbursed for fees in excess of the $125 per hour cap because of changes in the cost of living. The ALJ EAJA Decision did not address these issues. Rather than do so here, we remand for the Comptroller to consider these issues in the first instance. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

## III

The Division brought an administrative proceeding against Loumiet, alleging he was an IAP under FIRREA and subject to a monetary fine. That case was dismissed on the merits because the evidence in the record did not establish a "significant adverse effect" on the Bank. 12 U.S.C. § 1813(u)(4). Nor does the evidence in the record establish that the Division was "substantially justified" under the EAJA to bring the underlying agency proceeding against Loumiet. 5 U.S.C. § 504(a)(1). No evidence supports an inference that the Bank suffered any "adverse effect" from the continued employment of Bank executives after the November and March Reports; nor does evidence support an inference of "adverse effect" from any other theory presented by the Comptroller. *See Taucher v. Brown-Hruska*, 396 F.3d 1168, 1173 (D.C. Cir. 2005) (requiring "a reasonable basis both in law and fact" to satisfy the EAJA's substantial justification

standard). As a result, we grant the petition for review and remand.

*So ordered.*