# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 13, 2018　　　　Decided January 28, 2020

No. 18-5020

CARLOS LOUMIET, ESQUIRE,
APPELLEE

v.

UNITED STATES OF AMERICA,
APPELLEE

MICHAEL RARDIN, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-01130)

———

*Tyce R. Walters*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Jessie K. Liu*, U.S. Attorney, and *Mark B. Stern*, Attorney.

*Carlos Loumiet*, pro se, argued the cause for appellee. On the brief was *Andrés Rivero*.

Before: GARLAND, *Chief Judge*, KATSAS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:   In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court held that the Fourth Amendment creates an implied damages action for unconstitutional searches against line officers enforcing federal drug laws.  In this case, we consider whether the First Amendment creates an implied damages action against officials in the Office of the Comptroller of the Currency (OCC) for retaliatory administrative enforcement actions under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).   Consistent with the Supreme Court's marked reluctance to extend *Bivens* to new contexts, we hold that the First Amendment does not create such an implied damages action.

I

In 1999, the OCC began an investigation of Hamilton Bank and three of its executives for the allegedly fraudulent concealment of some $22 million in loan losses.  The bank retained an outside law firm to investigate the charges.  Carlos Loumiet, then a partner at the law firm, prepared two reports.  The first one, made for the bank's auditing committee and shared with the OCC, was issued in November 2000.  It found no convincing evidence that the executives had fraudulently concealed the losses.  The OCC was skeptical and provided Loumiet with additional evidence.   In response, Loumiet prepared a second report, issued in March 2001.  It concluded that the disputed transactions were poorly handled but still found insufficient evidence to conclude that the executives had fraudulently concealed the losses.  The OCC disagreed and placed the bank into a receivership.  Later, the executives were indicted.  Two of them pleaded guilty; the third, Hamilton's former chairman and chief executive officer, was convicted

and sentenced to thirty years of imprisonment.  *United States v. Masferrer*, 514 F.3d 1158 (11th Cir. 2008).

According to Loumiet, OCC officials engaged in various forms of misconduct during the investigation.  The alleged misconduct included lying to Hamilton officers, threatening to retaliate against its lawyers, and making racist statements.  In March and April 2001, Loumiet raised these allegations with the Secretary of the Treasury, the Inspector General of the Treasury Department, and the Comptroller.  In June 2001, Loumiet met with an attorney in the Inspector General's Office to discuss his allegations.  In July 2001, the Inspector General concluded that there was no basis to investigate them any further.  Nonetheless, Loumiet represented the bank in suing the OCC for alleged civil-rights violations.  The bank voluntarily dismissed its suit in 2002.  Order of Dismissal, *Hamilton Bank, N.A. v. Comptroller*, No. 01-4994 (S.D. Fla. Oct. 16, 2002), ECF Doc. 64.

In 2006, after the Hamilton executives were convicted, the OCC brought an administrative enforcement action against Loumiet, one of his partners, and his law firm.  The OCC proceeded under FIRREA, which allows it to seek civil penalties from "any institution-affiliated party" who breaches a fiduciary duty to a federally-insured bank and thereby "causes or is likely to cause more than a minimal loss" to the bank.  12 U.S.C. § 1818(i)(2)(B).  In turn, FIRREA defines an "institution-affiliated party" to include "any attorney" who "knowingly or recklessly participates in" a breach of fiduciary duty that "caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on" the bank.  *Id.* § 1813(u)(4).  The law firm and Loumiet's partner settled with the OCC and agreed to pay $750,000 in fines.  Loumiet contested the charges against him.  An Administrative Law Judge recommended their dismissal on the ground that Loumiet

4

had not breached any fiduciary duty.  Recommended Decision, *In re Loumiet*, OCC-AA-EC-06-102 (June 18, 2008).  The Comptroller disagreed, but nonetheless dismissed on the alternative ground that Loumiet had not caused the bank any harm.  Final Decision & Order, *In re Loumiet*, OCC-AA-EC-06-102 (July 27, 2009).

Loumiet sought fees under the Equal Access to Justice Act (EAJA).  In pertinent part, EAJA allows a prevailing private party in an administrative adjudication to recover "fees and other expenses" unless the adjudicator "finds that the position of the agency was substantially justified."  5 U.S.C. § 504(a)(1).  The OCC denied fees, but we reversed on the ground that there was no substantial justification for the OCC's position that Loumiet could have significantly harmed the bank. *Loumiet v. OCC*, 650 F.3d 796 (D.C. Cir. 2011).  We reasoned that even if Loumiet's false exoneration of the executives caused the bank to "retain the dishonest officers," there was no evidence that this harmed the bank. *Id.* at 800.  On remand, Loumiet was awarded $675,000.

Loumiet then filed this lawsuit against the United States and four OCC officials.  He asserted *Bivens* claims against the officials as well as various tort claims.  The *Bivens* claims rest on the theory that the officials caused the OCC enforcement action in retaliation for Loumiet's protected speech criticizing the OCC investigation, in violation of the First and Fifth Amendments of the Constitution.  The district court held that the *Bivens* claims were untimely, and it dismissed the tort claims on other grounds. *Loumiet v. United States*, 65 F. Supp. 3d 19 (D.D.C. 2014).  We reversed both rulings. *Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016).

On remand, the district court declined to dismiss the First Amendment *Bivens* claims. *Loumiet v. United States*, 255

F. Supp. 3d 75, 83–96 (D.D.C. 2017). The court reasoned that prior decisions had already "recognized the existence of a *Bivens* implied cause-of-action for retaliatory prosecution in violation of the First Amendment." *Id.* at 84. Likewise, the court concluded that the procedural and remedial protections provided under FIRREA do not counsel against recognizing an implied damages action. *See id.* at 85–90. The court further held that the complaint plausibly stated First Amendment claims against the OCC officials who allegedly "induce[d] an enforcement action against Plaintiff in reprisal for critical statements that he made against them and the OCC more generally." *Id.* at 95. And it denied those officials qualified immunity on the ground that the "First Amendment right to be free from retaliatory prosecution" was clearly established long before 2006. *Id.* at 93 (quotation marks omitted). Finally, the court held that the Fifth Amendment count did not state a claim, converted the tort claims against the individual defendants into claims against the United States, and dismissed some but not all of the tort claims. *Id.* at 97–100.

After the Supreme Court decided *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the officials moved for reconsideration. The district court denied the motion. *Loumiet v. United States*, 292 F. Supp. 3d 222 (D.D.C. 2017). In light of *Abbasi*, the court assumed that Loumiet was seeking to extend *Bivens* into a "new context." *Id.* at 229. But the court concluded that the "special factors counselling hesitation" in *Abbasi*, which involved programmatic actions undertaken by high-ranking officials in response to terrorist attacks, were not present in this case. *Id.* at 227 (quotation marks omitted); *see id.* at 229–31. Finally, the court discounted the significance of EAJA in its special-factors analysis because that statute was not enacted as part of FIRREA. *Id.* at 232–38.

The OCC officials now seek review of the district court's refusal to dismiss the First Amendment claims against them.

## II

We begin, as we must, with our jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). We have jurisdiction to review "final decisions" of the district court. 28 U.S.C. § 1291. Under the collateral-order doctrine, the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision'" within the meaning of section 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We thus have jurisdiction to decide whether the OCC officials are entitled to qualified immunity on the First Amendment claims.

We also have jurisdiction to decide whether the First Amendment confers upon Loumiet an implied cause of action for damages. Because "the recognition of the entire cause of action" is "directly implicated by the defense of qualified immunity," both questions are "properly before us on interlocutory appeal." *Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007) (quotation marks omitted); *see Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 917–18 (D.C. Cir. 2018).

## III

In this court, the OCC officials contend that the First Amendment creates no implied cause of action for damages and that, in any event, they are entitled to qualified immunity on the facts alleged by Loumiet. We begin with the cause-of-action question, which is antecedent to the question of qualified immunity. *See Liff*, 881 F.3d at 918 ("it is appropriate to determine the availability of a *Bivens* remedy at the earliest practicable phase of litigation").

7

A

The Free Speech Clause of the First Amendment provides that "Congress shall make no law … abridging the freedom of speech." Neither the First Amendment, nor any other provision of the Constitution, provides an express cause of action for its own violation. Congress has provided a statutory cause of action against state officials for violations of the federal Constitution, 42 U.S.C. § 1983, but it has provided no such cause of action against federal officials. Nonetheless, Loumiet asks us to hold that the First Amendment, by its own force, creates an implied cause of action for damages against OCC and other federal officials for retaliatory enforcement activities.

The Supreme Court first recognized an implied damages action under the Constitution in *Bivens*. There, the Court held that the Fourth Amendment creates an implied damages action against federal narcotics officers for unconstitutional searches and seizures. 403 U.S. at 389. Over the next decade, the Supreme Court recognized two more implied damages actions under the Constitution—one under the Fifth Amendment against members of Congress for employment discrimination on the basis of sex, *Davis v. Passman*, 442 U.S. 228, 248–49 (1979), and one under the Eighth Amendment against federal prison officials for failure to provide adequate medical care, *Carlson v. Green*, 446 U.S. 14, 19 (1980).

Since *Carlson*, however, the Supreme Court has carefully circumscribed *Bivens* and "consistently refused to extend *Bivens* to any new context or new category of defendants." *Abbasi*, 137 S. Ct. at 1857 (quotation marks omitted). Recognizing an implied damages action "is a significant step under separation-of-powers principles." *Id.* at 1856. Imposing personal liability on federal officers may promote important interests in deterring constitutional violations and redressing

injuries, but it also "create[s] substantial costs" for the officers, the government, and citizens who depend on the vigorous enforcement of federal law. *Id.* The Constitution itself is silent on how to balance these competing considerations in various contexts, and judges are not well-suited to do so. Rather, "[i]n most instances … the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability." *Id.* at 1857 (quotation marks omitted). Moreover, in the decades since *Bivens* was decided, the Court has grown wary of creating implied damages actions in other contexts. *See id.* at 1855–56. For these reasons, "expanding the *Bivens* remedy is now a disfavored judicial activity," so the Supreme Court demands "caution before extending *Bivens* remedies into any new context." *Id.* at 1857 (quotation marks omitted).

Exercising this caution, the Supreme Court has not recognized a new *Bivens* action in the four decades since *Carlson* was decided. At the same time, the Court has declined to extend *Bivens* on ten separate occasions. Once, it declined to create a *Bivens* cause of action because Congress had made another remedy expressly exclusive. *Hui v. Castaneda*, 559 U.S. 799, 805–07 (2010). Twice, it declined to extend *Bivens* to areas where Congress had provided an alternative scheme of protections and remedies. *Schweiker v. Chilicky*, 487 U.S. 412, 424–29 (1988) (Social Security disability benefits); *Bush v. Lucas*, 462 U.S. 367, 380–90 (1983) (federal employment). Three times, it declined to extend *Bivens* to sensitive areas. *Abbasi*, 137 S. Ct. at 1860–63 (national security); *United States v. Stanley*, 483 U.S. 669, 678–86 (1987) (military); *Chappell v. Wallace*, 462 U.S. 296, 298–305 (1983) (military). Three times, it declined to extend *Bivens* to new categories of defendants. *Minneci v. Pollard*, 565 U.S. 118, 126–31 (2012) (private individuals); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70–74 (2001) (private corporations); *FDIC v. Meyer*, 510

U.S. 471, 484–86 (1994) (federal agencies). Once, it declined to extend *Bivens* simply because Congress is better positioned to evaluate when agency officials "push too hard for the Government's benefit," and what consequences should follow if they do so. *Robbins*, 551 U.S. at 562.

After reviewing these precedents, *Abbasi* set out a two-part test to decide when to recognize implied damages actions under *Bivens*. First, we must consider whether the plaintiff seeks to extend *Bivens* into a "new context." If so, we then must consider whether there are any "special factors counselling hesitation." *See* 137 S. Ct. at 1857–60.

## B

The new-context inquiry in this case is straightforward. According to the Supreme Court, "[t]he proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Abbasi*, 137 S. Ct. at 1859. The Court has provided a non-exhaustive "list of differences that are meaningful enough to make a given context a new one":

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60. In addition, a "new context" is present whenever the plaintiff seeks damages from a "new category of defendants." *See id.* at 1857 (quotation marks omitted); *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015). Under these criteria, "even a modest extension is still an extension," and so "the new-context inquiry is easily satisfied." *Abbasi*, 137 S. Ct. at 1864–65.

This case clearly presents a new *Bivens* context. First, the constitutional right at issue differs from the ones at issue in *Bivens*, *Davis*, and *Carlson*. Loumiet alleges a violation of the Free Speech Clause of the First Amendment, but *Bivens* was a Fourth Amendment search-and-seizure case, 403 U.S. at 389; *Davis* was a Fifth Amendment sex-discrimination case, 442 U.S. at 231; and *Carlson* was an Eighth Amendment medical-care case, 446 U.S. at 16 & n.1. Although the Supreme Court twice has assumed that the First Amendment creates an implied cause of action for damages, *see Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (Free Exercise Clause); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (Free Speech Clause), it has "never held that *Bivens* extends to First Amendment claims," *Reichle v. Howards*, 566 U.S. 658, 663–64 n.4 (2012). *Abbasi* removed any possible doubt on this point. There, the Supreme Court stressed that "three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." 137 S. Ct. at 1855. To the extent we suggested otherwise in *Munsell v. Department of Agriculture*, 509 F.3d 572, 587–88 (D.C. Cir. 2007)—a case rejecting *Bivens* claims for failure to exhaust, *see id.* at 591—*Reichle* and *Abbasi* have displaced that dicta. And though we previously recognized First Amendment *Bivens* claims in *Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987), and *Moore v. Valder*, 65 F.3d 189, 196 n.12 (D.C. Cir. 1995), those cases have been overtaken by *Abbasi*'s holding that the new-context analysis may consider only

Supreme Court decisions approving *Bivens* actions.  *See* 137 S. Ct. at 1859.

Second, the legal mandate under which the OCC officials were operating is different from the ones in *Bivens*, *Davis*, and *Carlson*.  The dispute here arose from the enforcement of federal banking laws under FIRREA, whereas *Bivens* involved the enforcement of federal drug laws, 403 U.S. at 389; *Davis* involved employment decisions by members of Congress, 442 U.S. at 230; and *Carlson* involved the provision of medical care to federal prisoners, 446 U.S. at 16.

Third, Loumiet seeks damages from a new category of defendants.  The defendants here are OCC officials, whereas the defendants in *Bivens* were federal narcotics agents, 403 U.S. at 389; the defendant in *Davis* was a former member of Congress, 442 U.S. at 230; and the defendants in *Carlson* were federal prison officials, 446 U.S. at 16.  For each of these reasons, this case presents a new context.

C

We next consider whether special factors counsel hesitation.  One factor stands out here: "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action."  *Abbasi*, 137 S. Ct. at 1858.  Likewise, "when alternative methods of relief are available, a *Bivens* remedy usually is not."  *Id.* at 1863.  Two Supreme Court cases—*Bush* and *Chilicky*—illustrate these special factors.

In *Bush*, the Court refused to extend *Bivens* to a federal employee allegedly demoted in retaliation for protected speech criticizing his employer.  462 U.S. at 368–69.  As the Court explained, federal workers are "protected by an elaborate, comprehensive scheme that encompasses substantive

provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed." *Id.* at 385; *see also id.* at 368 (observing that the scheme affords "meaningful remedies against the United States"). The Court held that such an "elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations," should not be "augmented by the creation of a new judicial remedy" for the claimed First Amendment violation. *Id.* at 388.

In *Chilicky*, the Court refused to extend *Bivens* to individuals denied Social Security disability benefits, allegedly in violation of the Fifth Amendment Due Process Clause. 487 U.S. at 414. Applying *Bush*, the Court concluded that the "administrative structure and procedures of the Social Security system" was a special factor counselling hesitation. *Id.* at 424. That system established "federal standards and criteria" for the provision of benefits, created "elaborate administrative remedies" for claimants denied benefits, and provided for "judicial review, including review of constitutional claims." *Id.* But it made "no provision for remedies in money damages against officials responsible for unconstitutional conduct that leads to the wrongful denial of benefits," and the Court declined to recalibrate the scheme to add that remedy. *Id.* at 424–25.

On three occasions, we have applied *Bush* and *Chilicky* to reject *Bivens* claims. In *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir. 1988) (en banc), we confirmed that the Civil Service Reform Act bars First Amendment *Bivens* claims by individuals allegedly denied federal employment or promotion in retaliation for protected speech. *See id.* at 224–25, 229. We stressed that, under *Bush* and *Chilicky*, "it is the comprehensiveness of the statutory scheme involved, not the

'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." *Id.* at 227. In *Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008), we held that the Privacy Act barred First and Fifth Amendment *Bivens* claims brought by a plaintiff alleging that her status as a covert agent had been unconstitutionally disclosed. *See id.* at 702–04. And we did so even though the Privacy Act, which authorizes private damages actions for willful violations, exempts the Offices of the President and the Vice President from coverage—and thus afforded no remedy against the defendants in the case. *See id.* at 706–08. In *Liff,* we held that the "myriad statutes and regulations that provide remedies for contracting-related disputes," which collectively afford a "spectrum of remedies," bar the imposition of *Bivens* liability for claims arising out of federal government contracts. *See* 881 F.3d at 920–21. In each of these cases, we declined to question whether the remedial scheme at issue was the "best response" in the specific context at issue, "for Congress is the body charged with making the inevitable compromises required." *Spagnola*, 859 F.2d at 228 (cleaned up).

Here, FIRREA's administrative enforcement scheme is likewise a special factor counselling hesitation. This scheme permits the imposition of civil penalties only for defined offenses such as knowingly breaching a fiduciary duty or recklessly engaging in an unsound banking practice. 12 U.S.C. § 1818(i)(2)(A)–(C). Any party subject to a penalty is entitled to advance notice and a hearing, *id.* § 1818(i)(2)(H), which must be conducted in accordance with the Administrative Procedure Act, *id.* § 1818(h)(1). Thus, the party is entitled to make arguments, cross-examine witnesses, and submit oral, documentary, and rebuttal evidence. 5 U.S.C. § 554(c)(1); *id.* § 556(d). Enforcement officials within the OCC bear the burden of proof and cannot participate or advise in the decision. *Id.* § 556(b) & (d). And the presiding official, if not the OCC

itself, must be a duly appointed ALJ, *id.* § 556(b), who must render a recommended decision on a closed record with a statement of reasons, *id.* § 557(c), and without any *ex parte* contacts relevant to the proceeding, *id.* § 557(d). FIRREA also requires the OCC to augment these procedures with implementing regulations, 12 U.S.C. § 1818(i)(2)(K), under which administrative respondents are entitled to be represented by counsel, 12 C.F.R. § 19.35; seek summary disposition, *id.* § 19.29; apply for document subpoenas, *id.* § 19.26; object to evidence, *id.* § 19.36(d); depose unavailable witnesses, *id.* § 19.36(f); and more. The ALJ's recommended decision is then subject to further review by the Comptroller himself, 5 U.S.C. § 557(b), and his decision in turn is subject to judicial review in a court of appeals, 12 U.S.C. § 1818(h)(2). Similar rules, protections, and review attend other exercises of OCC administrative enforcement, including the adjudication of cease-and-desist orders, *id.* § 1818(b), and the removal of affiliated individuals from participating in a bank's affairs, *id.* § 1818(e). Together, these provisions afford regulated parties an "alternative, existing process for protecting [their] interest." *Abbasi*, 137 S. Ct. at 1858 (quotation marks omitted).

Moreover, the FIRREA enforcement scheme gives regulated parties a sword as well as a shield. Under EAJA, any party prevailing in a contested agency adjudication is entitled to "fees and other expenses incurred by that party in connection with that proceeding," unless the ALJ "finds that the position of the agency was substantially justified or that special circumstances make an award unjust." 5 U.S.C. § 504(a)(1). This stands in marked contrast to the American Rule, under which "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). Fee awards under EAJA can be substantial, as evidenced by Loumiet's own award of $675,000. The FIRREA

scheme thus affords "meaningful remedies against the United States," *Bush*, 462 U.S. at 368, as a general matter and in this case.

One more aspect of the scheme is important—judicial review, although available, is carefully circumscribed. Specifically, FIRREA provides that "[j]udicial review" of any OCC administrative adjudication "shall be exclusively as provided" in FIRREA itself, which channels such review to the courts of appeals. 12 U.S.C. § 1818(h)(1) & (2). Likewise, FIRREA provides that, in any district-court action to enforce a civil penalty, "the validity and appropriateness of the penalty shall not be subject to review." *Id.* § 1818(i)(2)(I)(ii). These provisions come close to foreclosing a *Bivens* action expressly, just as the exclusive-review provision at issue in *Castaneda* expressly foreclosed *Bivens* actions against officers of the Public Health Service. *See* 559 U.S. at 805–06. At a minimum, the precise nature of the available judicial review makes clear that Congress did not "inadvertently" omit a damages remedy from FIRREA, *see Liff*, 881 F.3d at 921; *Wilson*, 535 F.3d at 708; *Spagnola*, 859 F.2d at 228, underscoring that the courts should not augment the scheme to supply one. *See Abbasi*, 137 S. Ct. at 1865 ("legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation").

Loumiet's contrary arguments are all without merit. First, he contends that the procedural protections afforded in the FIRREA administrative process are not remedies at all. True enough, but they do help constrain the unconstitutional exercise of government power—unlike the largely or wholly unregulated search in *Bivens*, hiring decision in *Davis*, and care provision in *Carlson*. Moreover, as explained above, we rely not only on procedural protections, but also on the affirmative EAJA remedy and the channeled nature of the judicial review

provided. Second, Loumiet contends that EAJA cannot be considered because it is a separate statute from FIRREA. But in *Liff,* we assessed special factors by considering the full "constellation of statutes and regulations governing federal contracts, as well as the Privacy Act." 881 F.3d at 920. There is no reason to disregard any of the statutes establishing the governing scheme. Third, Loumiet contends that he is not subject to the FIRREA scheme at all, because the Comptroller concluded that he is not an institution-affiliated party. But Loumiet—as an attorney for a federally-insured bank—was not wholly outside the regulatory scheme. To the contrary, the Comptroller concluded that Loumiet was not an institution-affiliated party only because his conduct did not harm the bank. If it had, he might have been subject to a penalty. *Compare* 12 U.S.C. § 1813(u)(4) (definition of "institution-affiliated party"), *with id.* § 1818(i)(2)(A)–(C) (penalties for institution-affiliated parties). Loumiet does not fall outside the FIRREA scheme simply because he won his individual case. Finally, Loumiet argues that the remedy afforded to him was insufficient. But *Bush* and *Chilicky* were decided on the premise that the available remedy in each of those cases— setting aside an adverse personnel decision or denial of benefits—was less effective than would be an award of full damages for all consequential harms. *See Chilicky*, 487 U.S. at 425. Moreover, we later held that, so long as the administrative scheme is comprehensive, a *Bivens* remedy is unavailable even if the plaintiff before the court is afforded no remedy at all. *See Wilson*, 535 F.3d at 709.

We recognize that retaliatory enforcement actions can be hard to ferret out in administrative processes and can impose harms well beyond those remediable through EAJA. On the other hand, charges of a retaliatory motive are easy to make, hard to disprove, potentially crippling to regulators, and perhaps not unlikely in the context of hotly contested

adversarial proceedings.  As in *Abbasi*, there is a hard "balance to be struck" in considering whether to create a damages remedy for the kind of claim that Loumiet seeks to press here. 137 S. Ct. at 1863.  That decision is best left to Congress.

## IV

The First Amendment creates no implied damages action against OCC officials for inducing an allegedly retaliatory administrative enforcement proceeding.  We therefore reverse the district court's judgment and remand the case with instructions to dismiss Loumiet's First Amendment claims.

*So ordered.*