**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT BOULE,

*Plaintiff-Appellant*,

v.

ERIK EGBERT; JANE DOE EGBERT,
and their marital community,

*Defendants-Appellees*.

No. 18-35789

D.C. No.
2:17-cv-00106-RSM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, Chief District Judge, Presiding

Argued and Submitted October 7, 2020
Seattle, Washington

Filed November 20, 2020
Amended May 20, 2021

Before: Susan P. Graber and William A. Fletcher, Circuit
Judges, and Nancy D. Freudenthal,[*] District Judge.

---

[*] The Honorable Nancy D. Freudenthal, United States District Judge
for the District of Wyoming, sitting by designation.

Order;
Dissent to Order by Judge Bumatay;
Dissent to Order by Judge Owens;
Dissent to Order by Judge Bress;
Opinion by Judge W. Fletcher

## SUMMARY[**]

### Civil Rights

The panel amended its opinion filed on November 20, 2020, ordered the amended opinion to be filed concurrently with the panel's order, and denied a petition for rehearing en banc after the matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration.

In the amended opinion, the panel reversed the district court's summary judgment for defendants in an action brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) by a United States citizen who alleged that a border patrol agent, acting on plaintiff's property within the United States, violated plaintiff's rights under the First and Fourth Amendments.

Plaintiff owns, operates and lives in a bed and breakfast in the state of Washington, on land which touches the United States-Canada border. Plaintiff alleged that a border patrol

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

agent entered the driveway of plaintiff's property to question arriving guests; used excessive force against plaintiff, and then, in response to plaintiff's complaints, retaliated against plaintiff by, among other things, contacting the Internal Revenue Service, asking the agency to look into plaintiff's tax status. The district court granted summary judgment to defendants on plaintiff's Fourth and First Amendment claims, holding that claims were impermissible extensions of *Bivens*.

The panel held that *Bivens* remedies were available in the circumstances of this case, where a United States citizen claimed that a border patrol agent violated the Fourth Amendment by using excessive force while carrying out official duties within the United States and violated the First Amendment by engaging in retaliation for protected speech.

Addressing the Fourth Amendment claim, the panel agreed with the district court that it presented an extension of previous *Bivens* cases in that Agent Egbert was an agent of the border patrol rather than of the F.B.I. But it was a modest extension, in that border patrol and F.B.I. agents are both federal law enforcement officials, and in that plaintiff's Fourth Amendment excessive force claim was indistinguishable from Fourth Amendment excessive force claims that are routinely brought under *Bivens* against F.B.I. agents. The panel did not find that special factors counseled hesitation such that a *Bivens* action in this new context was foreclosed. Plaintiff, a United States citizen, brought a conventional Fourth Amendment excessive force claim arising out of actions by a rank-and-file border patrol agent on plaintiff's own property in the United States. This context was a far cry from the contexts in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), and *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020), where the Supreme Court found that special

factors counseled against a *Bivens* action.  The panel held that any costs imposed by allowing a *Bivens* claim to proceed were outweighed by compelling interests in favor of protecting United States citizens on their own property in the United States from unconstitutional activity by federal agents.

Addressing the First Amendment claim, the panel noted that although the Supreme Court wrote in *Hartman v. Moore*, 547 U.S. 250 (2006), that *Bivens* extends to First Amendment retaliation claims when federal law enforcement officials have no innocent motives for their action, the panel recognized that the Supreme Court has not expressly so held. The panel therefore concluded that plaintiff's First Amendment retaliation claim arose in a new context. However, the panel found no special factors that made it inadvisable to find a cognizable *Bivens* claim.  The panel first noted that in *Gibson v. United States*, 781 F.2d 1334 (9th Cir. 1986), this court upheld a *Bivens* claim against federal officers who sought to curb plaintiff's protected First Amendment speech.  Second, although the panel recognized that the Supreme Court declined to recognize a *Bivens* action in *Bush v. Lucas*, 462 U.S. 367 (1983), that case involved a very different context, arising out of an employment relationship that was governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States.  Third, there was even less reason to hesitate in extending *Bivens* to plaintiff's First Amendment retaliation claim than there was to his Fourth Amendment excessive force claim given that Agent Egbert was not carrying out his official duties when he contacted the Internal Revenue Service and other agencies asking for investigation of plaintiff.

The panel rejected the suggestion that plaintiff had alternative remedies that would defeat a *Bivens* claim. The panel first noted that in *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court held that the existence of a remedy under the Federal Torts Claim Act, 28 U.S.C. § 2680(h) did not foreclose a *Bivens* action. Second, a state-law trespass claim against Agent Egbert in his individual capacity was barred by the Westfall Act. Finally, injunctive relief was an inadequate remedy, for plaintiff was seeking damages rather than protection against some future act.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan, Ikuta, Bennett, R. Nelson, Lee and VanDyke, stated that the court had extended *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) to two new contexts: one involving the First Amendment and another involving the Fourth Amendment at the border. By avoiding the Constitution's limits on the judicial power, the court had become an outlier among its fellow circuit courts, established itself as a quasi-legislature and improperly disregarded the Supreme Court's precedents. Judge Bumatay wrote that the court could not respond to executive transgression of the Constitution with its own judicial overreach; it was not within the power of federal judges to create a cause of action for plaintiff, no matter how convinced they were that he deserved one.

Dissenting from the denial of rehearing en banc, Judge Owens, referring to a law review article he wrote in 1997, John B. Owens, Note, *Judge Baer and the Politics of the Fourth Amendment: An Alternative to Bad Man Jurisprudence*, 8 Stan. L. & Pol'y Rev. 189 (1997) (pointing out the limitations of *Bivens* actions and setting forth some

admittedly pie in the sky solutions), stated that he continues to believe that new legislation that permits plaintiffs to vindicate their rights is better than the current jurisprudential word jumble.

Dissenting from the denial of rehearing en banc, Judge Bress, joined by Judges Bade, Collins and Hunsaker, stated that the panel opinion in this case recognized two novel implied rights of action under *Bivens*. In so doing, the panel decision was significantly out of step with modern Supreme Court cases emphasizing that the *Bivens* remedy is not to be lightly extended. Judge Bress stated that there were many reasons counseling hesitation in devising court-created First and Fourth Amendment damages remedies against a federal agent for actions relating to his investigation of an international traveler near the international border.

## COUNSEL

Breean L. Beggs (argued), Paukert & Troppmann PLLC, Spokane; Gregory Donald Boos, W. Scott Railton, and Halley Carlson Fisher, Cascadia Cross-Border Law, Bellingham, Washington; for Plaintiff-Appellant.

Geoff Grindeland (argued) and Nikki Carsley, Seamark Law Group PLLC, Bainbridge Island, Washington, for Defendants-Appellees.

Matt Adams (argued), Northwest Immigrant Rights Project, Seattle, Washington; Mary Kenney, American Immigration Council, Washington, D.C.; Trina Realmuto, American Immigration Council, Brookline, Massachusetts; for Amici

Curiae American Immigration Council and Northwest Immigrant Rights Project.

---

**ORDER**

The opinion filed on November 20, 2020, and reported at *Boule v. Egbert*, 980 F.3d 1309 (9th Cir. 2020), is amended, and the amended opinion is filed concurrently with this order.

An active judge of this court *sua sponte* requested a vote on whether to rehear this case en banc. A vote was taken and the matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. *See* Fed. R. App. P. 35(f). Rehearing en banc is **DENIED**.

Judge Bumatay's, Judge Owens's, and Judge Bress's dissents from the denial of rehearing en banc are attached and filed concurrently with this order.

---

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA, BENNETT, R. NELSON, LEE, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

Contrary to common belief, the Constitution's "radical innovation" is not its various enumerated rights—as cherished and fundamental as they are.[1] It is the Constitution's design for the separation of powers that has become among the "most important contributions to human

---

[1] Neil Gorsuch, A Republic, If You Can Keep It 40 (2019).

liberty."**²**    Having "lived among the ruins of a system of intermingled legislative and judicial powers," our Founders sensed the "sharp necessity to separate the legislative from the judicial power." *Plaut v. Spendthrift Farm, Inc*., 514 U.S. 211, 219, 221 (1995). The result is the clear division of authorities between Congress's "legislative powers" and the Judiciary's "judicial Power." U.S. Const. art. I, § 1; *id.* art. III, § 1.

In this case, we are asked to decide which branch of government may create the legal remedies available to the people for constitutional violations. From the ratification of the Bill of Rights until 1971, the Judiciary has rightfully respected the separation of powers and deferred to Congress and the States to provide remedies for such violations. That all changed when the Supreme Court for the first time read an *implied* cause of action into the Constitution for violation of the Fourth Amendment. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Court, of course, did not ground such a ruling in the text or history of the Constitution, but relied on the amorphous belief that federal courts have the authority to "make good the wrong done." *Id*. at 396.

Since then, however, the Court has seemingly shown buyer's remorse— recognizing *Bivens* as a judicial usurpation of the legislative function and blocking its expansion to any new amendments, contexts, or defendants. In consequence, the judicial practice of creating constitutional causes of action is widely considered disfavored—if not a dead letter.

---

**²** *Id.*

Against this current, our court charges ahead, resurrecting *Bivens* in spite of the Court's clear instructions. Here, we extend *Bivens* to two new contexts: one involving the First Amendment and another involving the Fourth Amendment at the border. Never mind that the Court has never extended *Bivens* to the First Amendment. And never mind that it has never extended *Bivens* to any case with national security implications.

By avoiding the Constitution's limits on the "judicial Power," we become an outlier among our fellow circuit courts and establish ourselves as a quasi-legislature. Because we far exceeded our limited judicial role and improperly disregarded the Court's precedents in this case, I respectfully dissent from the denial of rehearing en banc.

**I.**

Robert Boule operates a bed and breakfast located directly adjacent to the border with Canada, in Blaine, Washington. *Boule v. Egbert*, 980 F.3d 1309, 1312 (9th Cir. 2020). The B&B is aptly called "Smuggler's Inn," because it's a notorious site for illegal border crossing.[3] Large shipments of cocaine, methamphetamine, ecstasy, and opiates have previously been intercepted at Smuggler's Inn. U.S. Border Patrol Agent Erik Egbert knew about this history. In fact, as a Border Patrol Agent investigating counterterrorism and cross-border crimes, Agent Egbert had been to Smuggler's Inn many times while on patrol and had apprehended persons who had illegally crossed the border at the spot.

---

[3] Boule has since been arrested by Canadian authorities and charged with human trafficking.

While on duty, Agent Egbert encountered Boule in town. To Egbert's recollection, Boule told him that a Turkish national would be arriving at Smuggler's Inn that day. Boule said that two of his employees went to the airport to pick up the individual. Agent Egbert decided to investigate the Turkish national's arrival.

Later that day, Agent Egbert waited in his patrol car near Smuggler's Inn for the Turkish guest. When the vehicle transporting the guest arrived, Agent Egbert followed it into the Inn's driveway. As Egbert approached, Boule asked the agent to leave. Agent Egbert refused, so Boule stepped between Egbert and the vehicle. Agent Egbert responded by pushing him to the ground, which later caused him to seek medical treatment. Agent Egbert then determined that the Turkish guest was lawfully in the country. Afterward, Boule complained to Egbert's superiors about the incident. In retaliation, Boule says, Agent Egbert contacted the Internal Revenue Service (asking it to investigate Boule's tax status) and various other government agencies.

Boule then brought this suit—filing *Bivens* claims for damages under the First and Fourth Amendment. First, Boule asserts that Agent Egbert violated his First Amendment rights by retaliating against him for complaining to the agent's superiors about the incident. Second, Boule contends that Agent Egbert violated his Fourth Amendment rights when he came onto his property, refused to leave, and pushed him to the ground.

The district court granted summary judgment in favor of Agent Egbert, refusing to extend *Bivens* under either amendment. Boule appealed, and the panel reversed. That was error.

## II.

The text of the Constitution provides for no express cause of action for damages against federal officials for violations of its provisions. And for almost 200 years, no *implied* cause of action existed under the Constitution either. That did not mean that remedies were unavailable for constitutional infringements by federal officials. Indeed, it was considered axiomatic at the Founding that for every "legal right, there is also a legal remedy." *Marbury v. Madison*, 5 U.S. 137, 163 (1803) (discussing 3 William Blackstone, Commentaries *23). But Founding-era courts did not fashion *their own* damages remedy under the Constitution.

Instead, from "the beginning of the nation's history," federal courts have recognized that federal officials were subject to "common law suits," which served as the remedy to their legal violations "as if they were private individuals." Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the Bivens Question*, 161 U. Pa. L. Rev. 509, 531 (2013). Thus, at our Founding, "only state law . . . furnished any redress for . . . unconstitutional conduct by federal officials." Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1506 (1987) (describing the remedy for the unconstitutional search of one's home).

The Supreme Court's "early adopted" rule was that a "government agent [was] personally liable for the breach of any duty imposed by the common law or by statute unless" the action was authorized by federal law. Note, *Developments in the Law: Remedies Against the United States and Its Officials*, 70 Harv. L. Rev. 827, 831–32 (1957). Under that rule, if the plaintiff could establish that the

official's conduct violated the Constitution, the "defendant's shield of federal power would dissolve, and he would stand as a naked [state-law] tortfeasor." Amar, *supra,* at 1506–07.

An early example of this remedial framework occurred during the Quasi-War between the United States and France in the administration of President John Adams. *See Little v. Barreme*, 6 U.S. 170 (1804). At the time, a federal statute authorized the President to order navy officers to seize ships sailing *to* France. *Id.* at 170–73. But in the case, the commander of an American warship had seized a Danish cargo ship sailing *from* France. *Id.* The ship's owner sued for trespass damages. *Id.* at 179. The Supreme Court upheld the naval officer's liability to suit because federal law did not warrant the capture of the ship. *Id.* at 176. As Chief Justice Marshall explained, a federal officer acting under federal law does so "at his peril;" if the officer's actions "are not strictly warranted by law[,] he is answerable in damages to any person injured by [the action's] execution." *Id.* at 170.

This view persisted through the Civil War, when tort suits were used against alleged federal government excesses. Andrew Kent, *Are Damages Different?: Bivens and National Security*, 87 S. Cal. L. Rev. 1123, 1163–64 (2014) (describing how "thousands of tort suits were filed against Union soldiers and civilian executive officials" during the Civil War).

The Supreme Court continued to adhere to this framework through most of the 20th century. In 1963, the Court still recognized that "[w]hen it comes to suits for damages for abuse of power, federal officials are usually governed by local law." *Wheeldin v. Wheeler*, 373 U.S. 647, 652 (1963). In the Court's view, "[f]ederal law" may "suppl[y] the defense, if the conduct complained of was done pursuant to

a federally imposed duty or immunity from suit." *Id*. (simplified). But it saw no occasion to create constitutional causes of action. In that case, a plaintiff sought to sue federal officers for serving a subpoena in violation of the Fourth Amendment. *Id.* at 649. Acknowledging the central role of the legislative branch in fashioning such a claim, the Court held that Congress had passed "no general statute making federal officers liable for acts committed 'under color,' but in violation, of their federal authority." *Id*. at 652. "Congress could, of course, provide otherwise, but it has not done so." *Id*.

Less than a decade later, however, the Court altered this framework. In 1971, the Supreme Court concluded *for the first time* that the violation of a constitutional protection—in this case, the Fourth Amendment—could give rise to a cause of action for money damages against federal agents. *Bivens*, 403 U.S. at 392, 397. While the Court conceded that the Fourth Amendment's text did not authorize such damages, it relied on the lack of any "explicit congressional declaration" foreclosing money damages and reasoned that no "special factors" counseled the Court to "hesitat[e]" to create a remedy in the absence of affirmative action by Congress. *Id*. at 396–97.

In the ten years following *Bivens*, the Court went on to accept implied causes of action for constitutional violations in only two additional cases. In 1979, the Court held that a federal employee could sue a congressman for gender discrimination under the Fifth Amendment's Due Process Clause. *See Davis v. Passman*, 442 U.S. 228 (1979). One year later, the Court held that a prisoner could sue federal prison officials for failing to adequately treat his medical conditions under the Eighth Amendment's Cruel and Unusual

Punishments Clause. *See Carlson v. Green*, 446 U.S. 14 (1980). This was the last time the Court has recognized a new *Bivens* claim.

Since then, the Court has backtracked on its adoption of implied rights of action under the Constitution. In fact, the Court has repeatedly refused to extend *Bivens* liability at all—not to any other amendment, new context, or category of defendants. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). By one count, the Court has expressly refused to extend Bivens on ten separate occasions. *See Loumiet v. United States*, 948 F.3d 376, 381 (D.C. Cir. 2020).[4] Instead, *Bivens* and its progeny have been cast as a "relic" of the "heady days in which [the] Court assumed common-law powers to create causes of action." *Corr. Servs. Corp.*, 534 U.S. at 75 (Scalia, J., concurring); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 750 (2020) (Thomas, J., concurring) ("The foundation for *Bivens*—the practice of creating implied causes of action in the statutory context—has already been abandoned.").

What brought about this change in the Court's jurisprudence? Well, since the 1980s, the Court has come to "appreciate more fully the tension between this practice [of creating causes of action] and the Constitution's separation of legislative and judicial power." *Hernandez*, 140 S. Ct. at 741. As the Court recognized, it is "a significant step under

---

[4] Three times due to the availability of alternative remedies; three times due to its national security or military context; and three times because of the involvement of new categories of defendants, such as private individuals, private corporations, and federal agencies. *Loumiet*, 948 F.3d at 381 (collecting cases). And once, simply because the Court decided that Congress is in a better position to craft a remedy for alleged retaliation by federal officials. *Id*.

separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017). Such action "risks arrogating legislative power." *Hernandez*, 140 S. Ct. at 741.

Fundamentally, "Congress is best positioned to evaluate whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government based on constitutional torts." *Id.* at 742 (simplified). Thus, the Court has made clear that the expansion of *Bivens* is a "'disfavored' judicial activity." *Abbasi*, 137 S. Ct. at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).

For that reason, the Court has adopted a two-step process to limit the recognition of new constitutional remedies. *See Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). The first question asks whether the claim arises in a context different from what the Court has previously recognized. *Hernandez*, 140 S. Ct. at 743. If so, the next question considers whether any special factors counsel hesitation before expanding *Bivens* to that new context. *Id.*

To decide whether any "special factors" bar the extension of *Bivens*, the inquiry focuses on "who should decide whether to provide for a damages remedy." *Abbasi*, 137 S. Ct. at 1857 (simplified). This analysis includes consideration of "the risk of interfering with the authority of the other branches," "whether there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," and "whether the Judiciary is well suited . . . to consider and

weigh the costs and benefits of allowing a damages action to proceed." *Hernandez*, 140 S. Ct. at 743 (simplified).

The threshold for what constitutes a "special factor" counseling hesitation is "remarkably low." *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009). Hesitation is counseled whenever "thoughtful discretion" would cause us to pause to even "consider" recognizing a new context. *Id*. If any special factors do exist, "then courts *must refrain* from creating an implied cause of action in that case." *Canada v. United States*, 950 F.3d 299, 309 (5th Cir. 2020) (simplified). In other words, "if [the court has] reason to pause before applying *Bivens* in a new context or to a new class of defendants—[the court must] reject the request." *Hernandez*, 140 S. Ct. at 743. The lesson from the Court is, thus, a strong presumption *against* expanding *Bivens*. When answering the ultimate question of who should decide on the creation of a new cause of action, the answer is almost always Congress.

Against this legal backdrop, the court clearly erred in extending *Bivens* to *two* new contexts in this case.

### III.

At bottom, this case distills down to the question of who should decide whether a right of action should exist for alleged violations of the First Amendment and of the Fourth Amendment in the border enforcement context. This court's answer: Judges. Rather than deferring to Congress, we casually craft for Boule new causes of action for his constitutional claims. This flies in the face of everything the Court has told us over the last 20 years and ignores our Constitution's core separation-of-powers concern. We should have corrected this error on en banc review.

**A.**

In summary fashion, the panel found no reason to pause before extending *Bivens* to Boule's First Amendment claim. *See Boule*, 980 F.3d at 1316.  It reasoned that retaliation is a well-known claim against government officials and that Agent Egbert's alleged retaliatory conduct was not related to his official duties as a Border Patrol agent.  *Id.*  The panel also did not think any alternative remedies existed for Boule. *Id.* at 1316–17.  In its amended opinion, the panel newly relies on dictum from *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

While the panel could think of no reasons to hesitate, there are at least four: (1) congressional silence, (2) Supreme Court precedent, (3) the precedent of our fellow circuits, and (4) the various potential alternative remedies available to Boule.

**1.**

Most fundamentally, the panel should not have created a new First Amendment cause of action because that is the business of Congress, not the courts.

Liberty, Hamilton famously warned, has "every thing to fear" from the union of these two powers.  The Federalist No. 78 (Alexander Hamilton).  But, he explained, "the general liberty of the people can never be endangered . . . so long as the judiciary remains truly distinct" from the legislature. *Id.* In 1625, Francis Bacon similarly cautioned that "[j]udges ought to remember that their office is *jus dicere*, and not *jus dare*; to interpret law, and not to make law, or give law." Francis Bacon, The Essays of Francis Bacon 251, 251 (Mary

Augusta Scott, ed. 1908). So, as federal judges, our limited role is "to say what the law is," and nothing more. *Marbury*, 5 U.S. at 177. Conversely, it is "the exclusive province of the Congress" to craft legislation. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

The panel dispensed with these principles when it created a cause of action against federal officers for retaliation under the First Amendment. The text of that amendment is, of course, not amenable to this construction: it prescribes only that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Indisputably, this provision does not create a private cause of action. Rather, it sets out a "fundamental law, limiting the powers of the Legislature, and with which every exercise of those powers must, necessarily, be compared."[5]

Neither can Congress's failure to create such a remedy be characterized as accidental or unknowing. In 1946, Congress passed the Federal Tort Claims Act, "which waived the sovereign immunity of the United States for certain torts committed by federal employees." *Brownback v. King*, 141 S. Ct. 740, 746 (2021) (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994)); *see* 28 U.S.C. §§ 1346(b)(1), 2674. Congress has also created a right of action for constitutional violations by *state* actors. *See* 42 U.S.C. § 1983. But insofar as Congress, through the FTCA and § 1983, has *not* provided a remedy to Boule for his retaliation claim, the separation of powers commands that we must respect that silence. *See Oliva v. Nivar*, 973 F.3d 438, 444

---

[5] Letter from James Iredell to Richard Spaight (Aug. 26, 1787), *in* Gordon Wood, The Creation of the American Republic 1776–1787, at 461 (1969).

(5th Cir. 2020) (the "silence of Congress" is a special factor counseling hesitation) (quoting *Abbasi*, 137 S. Ct. at 1862). Especially because, as the FTCA and § 1983 demonstrate, "Congress . . . knows how to create a cause of action to recover damages for constitutional violations when it wishes to do so." *Hernandez*, 140 S. Ct. at 752 (Thomas, J., concurring).

**2.**

We also should have hesitated because the Supreme Court has expressly declined to extend *Bivens* to the First Amendment context. Back in 1983, even during the heyday of *Bivens* expansions, the Court refused to allow a federal employee to sue his supervisor for retaliatory demotion under the First Amendment. *See Bush v. Lucas*, 462 U.S. 367 (1983). The Court assumed that the federal agency violated his First Amendment right but still declined to create a new *Bivens* remedy for the employee. *Id.* at 372, 390. In doing so, the Court declined to say whether it was "good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights." *Id.* at 390. Instead, the Court concluded that "Congress is in a better position to decide whether or not the public interest would be served by creating it." *Id.* Since then, the Court's position has not changed. *See Iqbal*, 556 U.S. at 675 ("Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment."); *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.").

The amended opinion now justifies its holding based on dictum in *Hartman*. *See* Am. Op. 41–44. There, the Court resolved the narrow issue of whether a plaintiff must plead

and show a lack of probable cause to bring a First Amendment retaliatory prosecution claim under *Bivens*. *Hartman*, 547 U.S. at 256. But rather than holding such a *Bivens* remedy exists, the Court appeared to assume it did. In doing so, the Court offered a single line that the panel now touts: "[w]hen the vengeful officer is federal, he is subject to an action for damages on the authority of *Bivens*." *Id*. It is clear this line was not part of the Court's analysis since it later qualified that its holding was limited to the "requirement[s] of causation, which [the plaintiff] must plead and prove in order to win, and our holding does not go beyond a definition of an element of the tort." *Id*. at 257 n.5. As the panel concedes, the line's status as dictum is confirmed by the later Court cases confirming that it has never extended *Bivens* to the First Amendment.

By relying on this stray line, we are again an outlier among our sister courts. Several circuit courts have expressly declined to read *Hartman* the way that our court does. *See Bistrian v. Levi*, 912 F.3d 79, 95–96 (3d Cir. 2018) (repudiating the Third Circuit's earlier reliance on *Hartman* to extend *Bivens* to the First Amendment claim); *Johnson v. Burden*, 781 F. App'x 833, 836–37 (11th Cir. 2019) (explaining that "the *Hartman* language was mere dicta"); *Storms v. Shinseki*, 319 F. Supp. 3d 348, 354 (D.D.C. 2018) (calling reliance on *Hartman* an "understandable mistake" and explaining that "[d]ecisions since *Hartman* have consistently said that the Supreme Court has not approved a First Amendment *Bivens* claim"), *aff'd*, 777 F. App'x 522 (D.C. Cir. 2019).

At the end of the day, the Supreme Court's reluctance to expand *Bivens* in the same context is itself a factor that counsels hesitation here.

**3.**

The panel's *Bivens* extension puts us out of step with our sister courts, too.  Since the adoption of the "counsels hesitation" test in 2007, circuit courts have nearly uniformly refused to extend *Bivens* to the First Amendment.  The Second, Fourth, Sixth, and D.C. Circuits have all refused to extend the doctrine to the First Amendment.[6]  Even courts that have not expressly made such a ruling have nonetheless expressed skepticism that *Bivens* could be expanded to the First Amendment.[7]

To be sure, the Third Circuit has recognized a First Amendment *Bivens* claim in more recent times.  *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 296–97 (3d Cir. 2016).  But importantly, the Third Circuit later backtracked on that

---

[6] *See, e.g.*, *Davis v. Billington*, 681 F.3d 377, 388 (D.C. Cir. 2012); *Turkmen v. Hasty*, 789 F.3d 218, 236 (2d Cir. 2015); *Doe v. Meron*, 929 F.3d 153, 169 (4th Cir. 2019); *Callahan v. Fed. Bureau of Prisons*, 965 F.3d 520, 523–24 (6th Cir. 2020).  The D.C. Circuit recognized a First Amendment *Bivens* claim in *Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987), and *Moore v. Valder*, 65 F.3d 189, 196 n.12 (D.C. Cir. 1995), but has since held that those cases "have been overtaken by *Abbasi*[.]"  *Loumiet*, 948 F.3d at 382.

[7] *See Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 35 (1st Cir. 2011) (noting that it is "questionable whether *Bivens* extends to cases asserting a violation of First Amendment rights or retaliation for the exercise of those rights"); *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1284 n.3 (11th Cir. 2012) (declining to decide whether *Bivens* reaches the First Amendment, but noting that "the Court has repeatedly declined to imply a *Bivens* remedy in a variety of contexts"); *Pahls v. Thomas*, 718 F.3d 1210, 1226 n.6 (10th Cir. 2013) ("[T]he Court has never held that a *Bivens* action is available against federal officials for a claim based upon the First Amendment."); *Brunson v. Nichols*, 875 F.3d 275, 279 n.3 (5th Cir. 2017).

decision, explaining that recent Supreme Court precedent "clearly communicates that expanding *Bivens* beyond those contexts already recognized by the Supreme Court is disfavored" and that it is Court precedent, "not our own prior precedent, that must guide us now." *Bistrian*, 912 F.3d at 95.

The panel's decision also creates a conflict within our own court. Although we had long ago recognized a First Amendment *Bivens* claim, *see Gibson v. United States*, 781 F.2d 1334, 1342 (9th Cir. 1986), we recently refused to find an implied cause of action to assert such a claim against private prison officials, *see Vega v. United States*, 881 F.3d 1146 (9th Cir. 2018). In declining to extend *Bivens*, we looked to the remedies available to the plaintiff under administrative procedures, federal regulations, state law, and the FTCA. *Id*. at 1154. We held that "[e]xpanding *Bivens* in this context . . . seems imprudent given the Court's admonition that 'any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Id*. at 1155 (quoting *Wilkie*, 551 U.S. at 550).

At the end of the day, we are the only federal appellate court in the nation trying to resurrect *Bivens* against the weight of the Court's precedents. This also counsels hesitation on our part.

**4.**

As we did in *Vega*, we should have looked at the potential for alternative remedies before casually expanding *Bivens* to Boule's new First Amendment context. An alternative remedy is sufficient to foreclose a *Bivens* extension even if it

does "not provide complete relief," *Bush*, 462 U.S. at 388, so "long as Congress' failure to provide money damages, or other significant relief, has not been inadvertent, courts should defer to its judgment," *Berry v. Hollander*, 925 F.2d 311, 314 (9th Cir. 1991) (simplified). Under this low bar, we had ample reason to deny a *Bivens* extension.

To make his First Amendment claim, Boule asserts that Agent Egbert contacted the Internal Revenue Service and asked it to investigate Boule's tax status in retaliation for Boule's complaints of the agent's misconduct. He also alleges that Agent Egbert made unjustified complaints to various other regulatory agencies.

To the extent that Boule alleges that Egbert unlawfully disclosed sensitive information about him, and that Egbert did so using information available to him because of his position with Border Patrol, he appears to be raising a Privacy Act violation. The Privacy Act requires agencies (such as the U.S. Border Patrol) to establish safeguards "to insure the security and confidentiality of records" and protect against disclosures that "could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." 5 U.S.C. § 552a(e)(10). Congress gave that mandate teeth by enacting civil remedies to enforce it. *Id.* § 552a(g)(1). As a result, a plaintiff may bring a civil action against an agency whenever it fails to comply with the Privacy Act's requirements "in such a way as to have an adverse effect on an individual." *Id.* § 552a(g)(1)(D).

Second, Boule may have an alternative remedy under the tax laws. If Boule alleges that Agent Egbert or someone at the IRS revealed confidential tax information, he might have

considered bringing a suit under 26 U.S.C. § 6103. That section provides that no "officer or employee of the United States" may "disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise." *Id.*

Third, Boule has a variety of state law claims at his disposal. For instance, Washington courts recognize the tort of outrage for when a defendant engages in "extreme and outrageous conduct." *See Spicer v. Patnode*, 9 Wash. App. 2d 283, 292 (2019). Or he might have availed himself of one of the several privacy torts that Washington recognizes. *See Eastwood v. Cascade Broad. Co.*, 106 Wash. 2d 466, 469 (1986) ("The protectable interest in privacy is generally held to involve four distinct types of invasion: intrusion, disclosure, false light and appropriation."). Washington also has an anti-harassment statute meant to address "invasions of a person's privacy by acts and words showing a pattern of harassment designed to coerce, intimidate, or humiliate the victim." Wash. Rev. Code Ann. § 10.14.010. If Boule alleges that Egbert was lying about him, then Boule could have a claim for defamation. *See Seaquist v. Caldier*, 8 Wash. App. 2d 556, 564 (2019) ("A prima facie defamation claim requires a plaintiff to prove falsity, an unprivileged communication, fault, and damages.").[8]

---

[8] The panel summarily concluded that the Westfall Act would bar any state law remedies to redress Boule's First Amendment claim. *Boule*, 980 F.3d at 1316. But this appears to be incorrect. The Westfall Act only applies when the Attorney General certifies that "the employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) (simplified). Here, the panel found Agent Egbert's alleged retaliation "had no relation to, or justification based on, his duties as a border patrol agent," *Boule*, 980 F.3d at 1316, and so the Westfall Act

The panel was, accordingly, wrong to suggest that Boule had *no* avenue for relief for his First Amendment claim. That Boule had several potential remedies is a "convincing reason . . . to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Indeed, the existence of just one alternative remedy is generally the end of the inquiry, *Ziglar*, 137 S. Ct. at 1865—even if that remedy is not "perfect," *Adams v. Johnson*, 355 F.3d 1179, 1185 n.3 (9th Cir. 2004).

* * *

All in all, our court today ignores several reasons to hesitate before extending *Bivens* to a First Amendment retaliation claim. Congress's silence is evidence that it would question the propriety of the remedy we draft, especially given the other statutory means for redress. The Court has also expressly refused to extend *Bivens* to the First Amendment; our fellow circuits have uniformly followed suit. And finally, Boule has alternative remedies available thanks to both Congress and the state of Washington.

## B.

Turning to Boule's Fourth Amendment claim for excessive force and unlawful search, given the national security implications of that claim, the panel should have also declined to extend *Bivens* to this new context.

---

would not apply. The amended opinion similarly concedes that Egbert "was not carrying out official duties" when he allegedly retaliated against Boule. Am. Op. at 44.

Frankly, this should have been an easy call. The Court has very clearly laid out its instructions regarding *Bivens* expansions in the border enforcement context, which implicates an "element of national security." *Hernandez*, 140 S. Ct. at 746. The Court first recognized the Executive's prerogative to "protect[] this country . . . by attempting to control the movement of people and goods across the border." *Id*. Included in this responsibility is the need to combat illegal cross-border traffic and powerful criminal organizations operating on both sides of the border. *Id*. The Court also acknowledged that Border Patrol agents are charged with the enormous task of responding to "terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States." *Id*. (quoting 6 U.S.C. § 211(c)(5)).

The Court thus firmly concluded that judges should refrain from extending *Bivens* when doing so would interfere with border enforcement. *Id*. at 747. "Since regulating the conduct of agents at the border unquestionably has national security implications, the risk of undermining border security provides reason to hesitate before extending *Bivens* into this field." *Id*. Decisions about our national security are "delicate, complex, and involve large elements of prophecy for which the Judiciary has neither aptitude, facilities, nor responsibility." *Id.* at 749 (simplified). The judicial intrusion into the border enforcement space is even more acute given that the "risk of personal damages liability" may "cause an official to second-guess difficult but necessary decisions concerning national-security policy." *Abbasi*, 137 S. Ct. at 1861. In other words, national security, and specifically, the conduct of agents at the border, is a red light to *Bivens* extensions.

Here, Agent Egbert is assigned to a unit that patrols the U.S.-Canadian Border and focuses on counterterrorism, cross-border crime, and drug and human trafficking. Smuggler's Inn is a notorious site of illegal border crossing, where the smuggling of people, drugs, illicit money, and other criminal objects frequently occurs. It also sits directly adjacent to Canada; if it were any closer, the property would be straddling the border.

On the date of the incident, while patrolling the area near Smuggler's Inn, Boule informed Agent Egbert that he would have a guest arriving from Turkey. While the exact details of the exchange between Boule and Agent Egbert are disputed, it is uncontested that Agent Egbert considered the information he received from Boule significant enough to investigate the arrival of the Turkish national. Agent Egbert became concerned that the Turkish national was planning to cross the border north into Canada or meet up with persons coming south into the United States for a criminal purpose. Based on this concern, Agent Egbert entered Boule's property, which led to the incidents at issue in the Fourth Amendment claim.

Thus, the subject of this litigation is a Border Patrol agent's conduct during an on-duty investigation of a foreign national, at a property known for smuggling activity, adjacent to an international border. Our hesitation to legislate in this area should have been uncontroversial. Given the national security implications of this case, we should have deferred to Congress to determine if a cause of action should lie with Fourth Amendment claims like Boule's.

Moreover, judicially crafting a *Bivens* action here could lead to a slew of unintended consequences, which we are not competent to evaluate. As the district court forewarned,

> [T]he risk of personal liability would cause Border Patrol agents to hesitate and second guess their daily decisions about whether and how to investigate suspicious activities near the border, paralyzing their important border-security mission. Likewise, . . . Congress is in the best position to evaluate the costs and benefits of a new legal remedy, particularly when it has already granted Border Patrol broad authority to secure the international border without providing a damages remedy for claims arising in that context.

*Boule v. Egbert*, No. C17-0106 RSM, 2018 WL 4078852, at \*4 (W.D. Wash. Aug. 24, 2018) (citations omitted).

Finally, the panel plowed forward even though Boule has already availed himself of a congressionally enacted remedy. The record reveals that Boule filed a tort claim with Customs and Border Protection for injuries arising out of the incident with Agent Egbert. He was able to do so because of the administrative remedy provided by the FTCA.[9] Even if the FTCA remedy does not provide the "exact same kind of relief" as *Bivens*, the mere existence of such an alternative is reason to hesitate here. *Oliva*, 973 F.3d at 444.

We should have corrected this *Bivens* error on en banc review.

---

[9] *See* 28 C.F.R. § 14.2; 28 U.S.C. § 2401; *see also* David C. Sarnacki, *Filing an Administrative Claim Under the Federal Tort Claims Act*, Wis. B. Bull. (Sept. 1988); *see also Claims for property damages or loss, or personal injury, or death*, U.S. Customs and Border Protection, https://help.cbp.gov/s/article/Article-178.

## IV.

The Constitution is a document of remarkable importance. Carefully following its commands is all that keeps us a government of laws and not of men. It is thus a matter of great seriousness when federal officials violate the Bill of Rights.

Yet, that same reverence for the Constitution leads me unambiguously to my conclusion today. We cannot respond to executive transgression of the Constitution with our own judicial overreach. As federal judges, it is not within our power to create a cause of action for Robert Boule, no matter how convinced we are that he deserves one.

Today, our court sanctions judicial legislation against the clear weight of Supreme Court precedent. And against the clear text of the Constitution. With respect, I dissent.

---

OWENS, Circuit Judge, dissenting from the denial of rehearing en banc:

Congress didn't care what I thought back in 1997 when I was 25 years old, and it probably cares less now as I approach 50. And though hopefully I've improved with age, our *Bivens* jurisprudence has not. I continue to believe that new legislation that permits plaintiffs to vindicate their rights is better than our current jurisprudential word jumble. *See* John B. Owens, Note, *Judge Baer and the Politics of the Fourth Amendment: An Alternative to Bad Man Jurisprudence*, 8 Stan. L. & Pol'y Rev. 189 (1997) (pointing out the

limitations of *Bivens* actions and setting forth some admittedly pie in the sky solutions).

---

BRESS, Circuit Judge, joined by BADE, COLLINS, and HUNSAKER, Circuit Judges, dissenting from the denial of rehearing en banc:

The panel opinion in this case recognizes two novel implied rights of action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In so doing, the panel decision is significantly out of step with modern Supreme Court cases emphasizing that the *Bivens* remedy is not to be lightly extended. *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 742–43 (2020); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857–58 (2017).

The causes of action that the panel fashioned arise in a decidedly new context from those few previous cases in which a *Bivens* remedy was permitted. *See Hernandez*, 140 S. Ct. at 743–44. And while the panel discerned no "special factors counseling hesitation" in creating two new *Bivens* causes of action, *Abbasi*, 137 S. Ct. at 1857, I think it self-evident that there are many reasons counseling hesitation in devising court-created First and Fourth Amendment damages remedies against a federal agent for actions relating to his investigation of an international traveler near the international border. Judge Bumatay's separate dissent forcefully highlights some of these reasons.

Because the panel decision is inconsistent with the Supreme Court's directives on *Bivens* remedies, I respectfully dissent from the denial of rehearing en banc.

---

**OPINION**

W. FLETCHER, Circuit Judge:

The Supreme Court first recognized an implied right of action for damages against federal officers in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Court held that damages were recoverable directly under the Fourth Amendment when federal officers arrested and searched the plaintiff without a warrant or probable cause, and when they employed unreasonable force in making the arrest. *Id.* at 389, 395–96. In the years after *Bivens*, the Court also has recognized implied rights of action for damages under the Fifth and Eighth Amendments. *See Davis v. Passman*, 442 U.S. 228 (1979) (recognizing a damages remedy for a gender discrimination claim against a United States Congressman under the equal protection component of the Fifth Amendment Due Process Clause); *Carlson v. Green*, 446 U.S. 14 (1980) (recognizing a damages remedy against federal prison officials for failure to provide adequate medical treatment under the Eighth Amendment's Cruel and Unusual Punishment Clause).

We are asked to decide whether a *Bivens* damages remedy is available to a United States citizen plaintiff who contends that a border patrol agent, acting on the plaintiff's property within the United States, violated his rights under the First

and Fourth Amendments. Although the Supreme Court has made clear that "expanding the *Bivens* remedy is now a disfavored judicial activity," a *Bivens* remedy is still available in appropriate cases and there are "powerful reasons" to retain it in its "common and recurrent sphere of law enforcement." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017) (internal quotation marks omitted).

In considering possible extensions of *Bivens*, we engage in a "two-step inquiry," "first inquir[ing] whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants'" and then "ask[ing] whether there are any 'special factors that counsel hesitation.'" *Hernandez v. Mesa*, 140 S.Ct. 735, 743 (2020) (citing *Abbasi*, 137 S.Ct. at 1859). Applying this framework, we reverse the district court and hold that Boule may pursue a *Bivens* remedy for his First and Fourth Amendment claims.

## I.  Background

Because this case comes before us on an appeal of a grant of summary judgment for Defendant, we draw all reasonable factual inferences in favor of Plaintiff, Robert Boule. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). We recite the facts viewed through that lens.

Boule is a United States citizen. He owns, operates, and lives in a small bed and breakfast inn in Whatcom County, in the city of Blaine, Washington. The back property line of the land on which the inn is located touches the United States-Canada border. At the time of the events in question, Boule was a paid informant for the government. He had been an informant for the Border Patrol beginning in about 2003 and for Immigration and Customs Enforcement beginning in

about 2008. Information provided by Boule about guests at
his inn had resulted in numerous arrests.

On March 20, 2014, Border Patrol Agent Erik Egbert
stopped Boule while he was running errands "in town" and
asked him about guests staying at the inn. Boule told Egbert
that he had a guest arriving that day from New York who had
flown in from Turkey the day before. Boule told him that
two of his employees were en route to pick up the guest at
Seattle-Tacoma ("Sea-Tac") International Airport, about 125
miles south of Blaine. Later that day, Egbert waited in his
border patrol vehicle near the inn. The entrance to the inn is
on a road at the front of the property. When the guest arrived,
Egbert followed the car carrying the arriving guest into the
driveway of the inn.

Agent Egbert got out of his vehicle and approached the
car. From the front porch of the inn, Boule asked Egbert to
leave. When Egbert refused, Boule stepped between Egbert
and the car and again asked him to leave. Egbert then shoved
Boule against the car. When Boule did not move away from
the car, Egbert grabbed him and pushed him aside and onto
the ground.

Agent Egbert then opened the car door and asked the
guest about his immigration status. Boule made a 911 call to
request a supervisor. Egbert also relayed the request over
dispatch. A supervisor and another agent arrived in response.
After concluding that the guest was lawfully in the country,
the three officers departed. Boule later sought medical
treatment for injuries to his back.

After Boule complained to Agent Egbert's superiors
about the incident, Egbert retaliated against Boule. Egbert

contacted the Internal Revenue Service, asking the agency to look into Boule's tax status. The Service conducted an audit of several years of Boule's tax returns, and Boule paid over $5,000 to his accountant to assist him in responding to the audit.   Egbert also contacted the Social Security Administration, the Washington State Department of Licensing, and the Whatcom County Assessor's Office, each of which then conducted formal inquiries into Boule's business activities.

Boule filed a complaint against Agent Egbert in federal district court, seeking damages under *Bivens* for a violation of Fourth and First Amendment rights.  The district court granted summary judgment to Egbert on Boule's Fourth and First Amendment claims, holding that they were impermissible extensions of *Bivens*.  Boule timely appealed.

## II.  Discussion

We review *de novo* a district court's decision on summary judgment.  *Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017).  We address Boule's Fourth and First Amendment claims in turn, applying the framework established in *Abbasi*, 137 S.Ct. at 1859, and relied on in *Hernandez*, 140 S.Ct. at 743.  We ask whether Boule's claims arise in a new context and, if so, whether any special factors counsel hesitation in finding a viable *Bivens* claim.  *Id.*

The Supreme Court's understanding of a "new context" in a *Bivens* analysis is "broad."  A context is "'new' if it is 'different in a meaningful way from previous *Bivens* cases decided by this Court.'"   *Id.* (citing *Abbasi*, 137 S.Ct. at 1859).  The Court wrote in *Abbasi*:

> Without endeavoring to create an exhaustive
> list of differences that are meaningful enough
> to make a given context a new one . . . [:]  A
> case might differ in a meaningful way because
> of the rank of the officers involved; the
> constitutional right at issue; the generality or
> specificity of the official action; the extent of
> judicial guidance as to how an officer should
> respond to the problem or emergency to be
> confronted; the statutory or other legal
> mandate under which the officer was
> operating; the risk of disruptive intrusion by
> the Judiciary into the functioning of other
> branches; or the presence of potential special
> factors that previous *Bivens* cases did not
> consider.

137 S. Ct. 1859–60.  The Court cautioned that "even a modest extension is still an extension."  *Id.* at 1864.

If we conclude that a claim arises in a new context, we ask "whether there are any special factors that counsel hesitation about granting the extension." *Hernandez*, 140 S. Ct. at 743 (citing *Abbasi*, 137 S. Ct. at 1857).  The Court acknowledged in *Abbasi* that it has not defined "special factors," but noted that

> the inquiry must concentrate on whether the
> Judiciary is well suited, absent congressional
> action or instruction, to consider and weigh
> the costs and benefits of allowing a damages
> action to proceed. Thus, to be a special factor
> counselling hesitation, a factor must cause a

> court to hesitate before answering that
> question in the affirmative.

137 S. Ct. at 1857–58 (internal quotation marks omitted).
The Court wrote in *Hernandez* that a court should "consider
the risk of interfering with the authority of the other
branches" and should "ask whether there are sound reasons to
think Congress might doubt the efficacy or necessity of a
damages remedy and whether the Judiciary is well suited,
absent congressional action or instruction, to consider and
weigh the costs and benefits of allowing a damages action to
proceed." *Hernandez*, 140 S. Ct. at 743 (internal citations
and quotation marks omitted).

## A. Fourth Amendment

The district court assumed that Boule's Fourth
Amendment excessive force claim is a "modest extension" in
a new context. We agree that it is an extension, in that Agent
Egbert is an agent of the border patrol rather than of the F.B.I.
But it is a modest extension, in that border patrol and F.B.I.
agents are both federal law enforcement officials, and in that
Boule's Fourth Amendment excessive force claim is
indistinguishable from Fourth Amendment excessive force
claims that are routinely brought under *Bivens* against F.B.I.
agents. However, we do not find that special factors "counsel
hesitation" such that a *Bivens* action in this new context is
foreclosed. Boule, a United States citizen, is bringing a
conventional Fourth Amendment excessive force claim
arising out of actions by a rank-and-file border patrol agent
on Boule's own property in the United States. This context
is a far cry from the contexts in *Abbasi* and *Hernandez*, where
the Court found that special factors counseled against a
*Bivens* action.

In *Abbasi*, the plaintiffs were foreign nationals who had been unlawfully present in the United States. Following the terrorist attacks on September 11, 2001, the F.B.I. designated plaintiffs as persons "of interest" in the post-attack investigation, and plaintiffs were incarcerated in harsh conditions. 137 S. Ct. at 1852–53. After plaintiffs were released and removed from the United States, they brought a *Bivens* action against federal executive officials and detention facility wardens, seeking damages based on the decisions that had led to their incarceration and based on the conditions of their confinement. *Id.* at 1851–52. The Court refused to allow a *Bivens* action, holding that special factors counseled hesitation in extending *Bivens* in this new context. *Id.* at 1859–61. The Court emphasized that the plaintiffs' claims challenged high-level Executive Branch decisions involving issues of national security. *Id.* at 1860–62.

In *Hernandez*, the plaintiffs were Mexican nationals whose child had been killed by a United States border patrol agent. 140 S. Ct. at 740. The agent had been on the United States side of the border, the child had been on the Mexico side, and the agent had shot at the child across the border. *Id.* The Mexican government had unsuccessfully sought extradition of the agent to Mexico. The U.S. Department of Justice had conducted an investigation and declined to bring charges against the agent. *Id.* The Court held that the parents' claims arose in a new context and were precluded by special factors. *Id.* at 744, 749. The Court noted several "warning flags," including the effect on foreign relations, the implications for national security, and the fact that the harm occurred in another country. *Id.* at 744, 746, 747.

The only aspects of the claim now before us that touch even tangentially on the concerns raised in *Abbasi* and

*Hernandez* are that Boule's inn is at the United States-Canada border and that Agent Egbert was investigating the status of a foreign guest who was arriving at the inn. In finding special factors in *Hernandez*, the Court wrote: "[S]ome [border patrol agents] are stationed right at the border and have the responsibility of attempting to prevent illegal entry. For these reasons, the conduct of agents positioned at the border has a clear and strong connection to national security." 140 S. Ct. at 746. The contrast between *Hernandez* and the case before us is self-evident. The agent in *Hernandez* was literally "at the border," tasked with policing the border and preventing illegal entry of goods and people. *See id.* As Egbert had already been informed by Boule, the arriving guest in whom Egbert was interested had been driven from Sea-Tac airport after arriving on a flight from New York. Further, the plaintiffs in *Hernandez* were foreign nationals, complaining of a harm suffered in Mexico. Boule is a United States citizen, complaining of harm suffered on his own property in the United States. Finally, the claim in *Hernandez* was extremely unusual. The claim against Egbert is a conventional Fourth Amendment excessive force claim, indistinguishable from countless such claims brought against federal, state, and local law enforcement officials, except for the fact that Egbert is a border patrol agent. As we noted above, excessive force Fourth Amendment claims are routinely brought against F.B.I. agents under *Bivens*. *See*, *e.g.*, *Ganek v. Leibowitz*, 874 F.3d 73 (2d Cir. 2017); *Soto-Torres v. Fraticelli*, 654 F.3d 153 (1st Cir. 2011); *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997).

The fact that Agent Egbert is a border patrol agent, standing alone, does not preclude a *Bivens* action. Courts in our circuit and others have allowed various *Bivens* actions against border patrol agents under the Fourth Amendment.

*See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (*Bivens* claim by American citizen of Guatemalan descent against Immigration and Customs Enforcement officials for detention without probable cause in violation of the Fourth Amendment); *Chavez v. United States*, 683 F.3d 1102 (9th Cir. 2012) (*Bivens* claim by American citizens for repeated traffic stops by border patrol agents in violation of the Fourth Amendment); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) (*Bivens* claim by Mexican citizen against a border patrol agent for excessive force at a port of entry in violation of the Fourth Amendment).

The Supreme Court cautioned in *Abbasi* that "national-security concerns must not become a talisman used to ward off inconvenient claims — a label used to cover a multitude of sins." 137 S. Ct. at 1862 (internal quotation marks omitted). After the Court's decision in *Abbasi*, we allowed an immigrant to pursue a *Bivens* action against an Immigration and Customs Enforcement attorney who had forged a document in order to prevent his adjustment of status to lawful permanent resident. *Lanuza v. Love*, 899 F.3d 1019, 1021 (9th Cir. 2018). We wrote that although "the Supreme Court has made clear that expanding the *Bivens* remedy is now a disfavored judicial activity," a *Bivens* remedy remains available in appropriate circumstances. *Id.* (internal quotation marks omitted). We distinguished *Abbasi*, noting that, like Boule in the case before us, the plaintiff did not "challenge high-level executive action" and did not "challenge or seek to alter the policy of the political branches." *Id.* at 1028, 1029. In a "run-of-the-mill immigration proceeding" where the alien had no ties to terrorism, the case was "unrelated to any other national security decision or interest." *Id.* at 1030. We held that "compelling interests that favor extending a *Bivens* remedy

. . . outweigh the costs of allowing this narrow claim to proceed against federal officials." *Id.* at 1033. Similarly, in the "run-of-the-mill" Fourth Amendment case now before us, we hold that any costs imposed by allowing a *Bivens* claim to proceed are outweighed by compelling interests in favor of protecting United States citizens on their own property in the United States from unconstitutional activity by federal agents.

In *Bivens* itself, the Fourth Amendment claim was not an improper intrusion by the judiciary into the sphere of authority of other branches. Nor is the Fourth Amendment claim here such an intrusion. Boule's Fourth Amendment excessive force claim is part and parcel of the "common and recurrent sphere of law enforcement" which, under *Abbasi*, is a permissible area for *Bivens* claims. *Abbasi*, 137 S. Ct. at 1857; *id.* at 1856 ("[I]t must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose."). We therefore conclude that Boule's excessive force Fourth Amendment claim may proceed as a *Bivens* damages claim.

## B. First Amendment

Boule also presented evidence that Agent Egbert retaliated against him for exercising his First Amendment right to complain to Egbert's superiors about his conduct at the inn. As recounted above, Egbert contacted the Internal Revenue Service, the Social Security Administration, the Washington State Department of Licensing, and the Whatcom County Assessor's Office, asking each of them to investigate Boule.

In *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012), the Supreme Court wrote that it had "never held that *Bivens* extends to First Amendment claims." It is true that the Court has never actually *held* that a First Amendment retaliation claim may be brought under *Bivens*. But in *Hartman v. Moore*, 547 U.S. 250 (2006), the Court explicitly stated, as part of its reasoning during the course of a *Bivens* analysis, that such a claim may be brought.

It has long been the law that federal officials violate the First Amendment when they retaliate for protected speech. *See*, *e.g.*, *Crawford-El v. Britton*, 523 U.S. 574, 592 (1998) ("[T]he general rule has long been clearly established" that "the First Amendment bars retaliation for protected speech . . ."). In *Hartman*, plaintiffs sought to bring a *Bivens* action, alleging that federal prosecutors had prosecuted them in retaliation for protected speech. The Court held that a *Bivens* action was unavailable, but only because probable cause supported the prosecution. The Court wrote that in the absence of probable cause — that is, in the absence of an innocent motive — a *Bivens* action would have been available:

> Official reprisal for protected speech "offends the Constitution [because] it threatens to inhibit exercise of the protected right," *Crawford-El v. Britton*, 523 U.S. 574, 588, n.10 (1998), and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out, *id.*, at 592[.] Some official actions adverse to such a speaker might well be unexceptionable

> if taken on other grounds, but when
> nonretaliatory grounds are in fact insufficient
> to provoke the adverse consequences, we have
> held that retaliation is subject to recovery as
> the but-for cause of official action offending
> the Constitution. *See Crawford-El*, *supra*,
> at 593[.] *When the vengeful officer is federal,*
> *he is subject to an action for damages on the*
> *authority of* Bivens. *See* 403 U.S., at 397.

*Hartman*, 547 U.S. at 256 (emphasis added) (some citations omitted).

Although the Supreme Court wrote in *Hartman* that *Bivens* extends to First Amendment retaliation claims when federal law enforcement officials have no innocent motive for their actions, we recognize that the Court has not expressly so held. *See Reichle*, 566 U.S. at 663 n.4. We therefore conclude that Boule's First Amendment retaliation claim arises in a new context.

However, we find no special factors that make it inadvisable to find a cognizable *Bivens* claim in this new context. First, we have already upheld a *Bivens* claim in a different First Amendment context. In *Gibson v. United States*, 781 F.2d 1334 (9th Cir. 1986), we upheld a Bivens claim against federal officers who sought to "curb" plaintiff's protected First Amendment speech through a campaign of defamation, illegal wiretapping, intimidation, burglary and arson.

Second, the Supreme Court declined to recognize a *Bivens* action in *Bush v. Lucas*, 462 U.S. 367 (1983), but in a very different context. Plaintiff in *Bush* was a federal

employee who had complained about his superior. The Court declined to recognize a *Bivens* action in this context "[b]ecause such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States." *Id.* at 368. Boule's claim is quite unlike the claim in *Bush*, where the employment relationship was key. Boule's claim is instead on all fours with the First Amendment retaliation claim described in *Hartman*, where the Court wrote that "[w]hen the vengeful officer is federal, he is subject to an action for damages on the authority of *Bivens*." *Hartman*, 457 U.S. at 256.

Third, there is even less reason to hesitate in extending *Bivens* to Boule's First Amendment retaliation claim than there is in his Fourth Amendment excessive force claim. Just as excessive force is a well-established Fourth Amendment claim, retaliation is a well-established First Amendment claim. *See Hartman*, 547 U.S. at 256 ("the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out"); *Lanuza*, 899 F.3d at 1033 (recognizing a *Bivens* action where "[t]he legal standards for adjudicating [it] are well established and administrable"). Boule's First Amendment retaliation claim presents an even stronger case for recognition as a *Bivens* claim. With respect to Boule's excessive force claim, Agent Egbert's actions, even if illegal, were taken during the performance of his official duties. The same is not true for Boule's retaliation claim. Though Egbert identified himself as a border patrol agent when he contacted the Internal Revenue Service, and may have done so when he contacted the Social Security Administration, the Washington State Department of Licensing, and the Whatcom County

Assessor's Office, he was not carrying out official duties in asking for investigations of Boule.

## C. Existence of Alternative Remedies

Finally, we consider whether there are available alternative remedies. When there are available alternative remedies sufficient to protect a plaintiff's interests, "a *Bivens* remedy usually is not" available. *Abbasi*, 137 S. Ct. at 1863; *see Fazaga v. Federal Bureau of Investigation*, 965 F.3d 1015, 1057 (9th Cir. 2020). The availability of alternative remedies "raises the inference that Congress expected the Judiciary to stay its *Bivens* hand and refrain from providing a new and freestanding remedy in damages." *Id.* (internal quotation marks omitted). "Alternative remedial structures can take many forms, including administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018) (internal quotation marks omitted). "[A]n alternative remedy need not be perfectly congruent with *Bivens* or perfectly comprehensive, [but] it still must be adequate." *Rodriguez v. Swartz*, 899 F.3d 719, 739 (9th Cir. 2018) (internal quotation marks omitted), *vacated on other grounds*, 140 S. Ct. 1258.

The district court assumed without deciding that there was no adequate alternative remedy that would preclude a *Bivens* claim. On appeal, Agent Egbert suggests three alternative remedies: "intentional-tort claims under the Federal Tort Claims Act, *see* 28 U.S.C. § 2680(h), a trespass claim against Agent Egbert, or injunctive relief." None of these suggested remedies defeats a *Bivens* action.

First, § 2680(h) of the FTCA, cited by Agent Egbert, includes the so-called law enforcement proviso, which allows

damage suits against federal law enforcement officials for "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court held that a *Bivens* action was available against federal prison officials for the death of a prisoner due to improper medical treatment in violation of the Eighth Amendment. The Court specifically addressed the relationship between *Bivens* and § 2680(h), holding that the existence of a remedy under § 2680(h) does not foreclose a *Bivens* action:

> [W]hen Congress amended FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers, 28 U.S.C. § 2680(h), the congressional comments accompanying that amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action. . . . In the absence of a contrary expression from Congress, § 2680(h) thus contemplates that victims of the kind of intentional wrongdoing alleged in this complaint shall have an action under FTCA against the United States as well as a *Bivens* action against the individual officials alleged to have infringed their constitutional rights.

*Id.* at 19–20.

Moreover, in 1988, when Congress amended the FTCA in the Westfall Act to provide that the FTCA remedy is generally exclusive, it made an "explicit exception for *Bivens*

claims." *Hui v. Castaneda*, 559 U.S. 799, 807 (2010). The Westfall Act provides that the exclusive remedy for common law tort claims committed by federal employees is against the United States, and that plaintiffs are precluded from bringing suit against the employees in their individual capacity. *See* 28 U.S.C. § 2679(b)(1). But the exclusiveness of the FTCA remedy was not extended to constitutional torts such as Fourth Amendment excessive force claims. *See id.* § 2679(b)(2)(A). A contemporaneous House Report explained:

> Since the Supreme Court's decision in Bivens, supra, the courts have identified this type of tort as a more serious intrusion of the rights of an individual that merits special attention. Consequently, H.R. 4612 would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights.

H.R. REP. NO. 100-700, at 6 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 5945, 5950.

Second, a state-law trespass claim against Agent Egbert in his individual capacity is barred by the Westfall Act. *See* 28 U.S.C. § 2679(d)(1) (generally barring individual capacity suits against a federal employee when the employee is "acting within the scope of his office or employment at the time of the incident out of which the claim arose"). Further, Egbert's entry onto the publicly accessible driveway of Boule's inn, undertaken as part of his official duties, was almost certainly a privileged entry under state law.

Finally, injunctive relief is an inadequate remedy, for Boule is seeking damages for Agent Egbert's completed actions rather than protection against some future act.

## Conclusion

We conclude that *Bivens* remedies are available in the circumstances of this case, where a United States citizen claims that a border patrol agent violated the Fourth Amendment by using excessive force while carrying out official duties within the United States, and violated the First Amendment by engaging in retaliation entirely unconnected to his official duties. We reverse and remand for further proceedings.

**REVERSED** and **REMANDED.**